SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
CHRISTOPHER L. AYERS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
973/584-9393 (fax)
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
cayers@seegerweiss.com

Local Counsel

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re ASCENA RETAIL GROUP, INC. SECURITIES LITIGATION | No. 2:19-cv-13529-KM-JBC |
| | CLASS ACTION |
| This Document Relates To: | CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | |
| | DEMAND FOR JURY TRIAL |

Lead Plaintiffs Joel Patterson and Michaella Corporation ("Lead Plaintiffs" or "Plaintiffs"), make the allegations set forth herein based upon knowledge as to their own acts and upon the investigation conducted by Lead Plaintiffs' counsel. That investigation included the examination and analysis of information obtained from public sources – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings made by Ascena Retail Group, Inc. ("Ascena" or the "Company"), regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons other than Defendants (defined below) who purchased or otherwise acquired Ascena common stock between December 1, 2015 and May 17, 2017, inclusive (the "Class Period"), against Ascena and certain of its officers and directors for violations of the federal securities laws. Plaintiffs bring this action seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     This action arises from Ascena's material overstatement of the value and business prospects of its subsidiary, ANN, Inc., ("ANN"), as well the value of

ANN's principal brands, Ann Taylor and LOFT.  Throughout the Class Period, Defendants materially misrepresented the value of ANN's intangible assets, including the value ascribed to its brands and associated goodwill.  Ultimately, the Company was forced to announce an over $1.3 billion impairment charge related to these assets.

3.      Ascena is a holding company with subsidiaries engaged in the female fashion retail industry.  The Company sells apparel and accessories from brick-and-mortar stores, as well as on the internet through a digital platform.  Ascena is the successor to The Dress Barn Inc., a discount fashion company that operated the "dressbarn" line of stores.

4.      In 2002, Defendant David Jaffe, the son of Dress Barn's founders, took over the family business after a career in finance and private equity.  He promptly began operating the Company like a fashion-focused private equity firm, leveraging the Company and conducting a string of acquisitions to expand the Company's portfolio.  Over the next decade, Ascena acquired multiple companies, including the owners of well-known retail brands Lane Bryant, Catherine's, Maurices, and Justice. The buying spree culminated with the ANN acquisition, representing a significant step in the Company's shift away from its discount fashion roots toward the premium fashion market.

5.    Throughout the Class Period, the Company materially misrepresented the value of ANN, ascribing a wildly inflated price to the value of its intangible assets and materially distorting the Company's balance sheet, earnings, and appearance of profitability.  The Company repeatedly assured investors that it was regularly reviewing the value of these assets.  Nevertheless, at the end of the Class Period, the Company announced material write-downs, slashing their value by more than half, shrinking the Company's balance sheet by over $1.3 billion, and substantially diminishing the Company's profits and financial prospects.

6.    Defendants were aware of material declines in ANN's business and financial performance well before the Company announced its impairment charge. Indeed, as Defendant Robert Giammatteo, the Company's Chief Financial Officer, admitted: "***This charge represents a significant change in the market environment we've seen over the past couple of years***."   In other words, Ascena's asset impairment was caused by developments ***during the Class Period*** that Defendants necessarily observed.

7.    These adverse developments required Defendants to review and correct the Company's valuation of ANN.  Defendants knew about the significant changes in the market environment for retailers like ANN and the Company's other businesses.  Defendants knew that traffic in ANN's brick-and-mortar stores was in drastic decline, and that ANN was heavily discounting its merchandise to entice

- 3 -

shoppers back into their stores, adversely affecting Ascena's gross margins and revenue.  Defendants knew that ANN's comparable store sales – a critical metric in the industry – were falling.  Defendants knew that the Company's stock price and market capitalization continued to deteriorate.

8.     These and other indicators required the Company to test and impair its goodwill and other intangible assets.  Nevertheless, despite the Company's mounting difficulties, Defendants continued to represent that the Company's goodwill and other intangible assets were valued at over $1.28 billion and $1.27 billion, respectively, and that its goodwill and trade names were not impaired.  Defendants did not – and could not have – believed these valuations.

9.     On May 17, 2017, Ascena announced that based on declining store sales and the significant decrease in the price of its common stock, the Company was undergoing an impairment analysis and expected to announce a material impairment charge to its goodwill and other intangible assets.  This announcement caused the price of Ascena common stock to plummet to just $2.06 per share on May 18, 2017 – a 85.5% decline from the Class Period high of $12.72 per share.

10.     Three weeks later, when the Company reported its quarterly financial results on June 8, 2017, the Company quantified its previously-announced impairment charge at ***$1.324 billion***.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b).  Ascena maintains its headquarters in this District and many of the acts and conduct that constitute the violations of the laws complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.

14.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Lead Plaintiffs purchased Ascena securities during the Class Period as set forth in their previously filed certifications, which are incorporated by reference herein, and were damaged thereby.

16.    Defendant Ascena is a leading national specialty retailer of apparel for women and tween girls.  Ascena stock trades under the ticker "ASNA" on the NASDAQ, an efficient market.  Ascena is a Delaware corporation with its principal place of business at 933 MacArthur Boulevard, Mahwah, New Jersey, 07430.  Prior to its incorporation in 2011, Ascena was known as The Dress Barn, Inc.  All references to Ascena or the Company include its predecessor The Dress Barn, Inc.

17.    Defendant David R. Jaffe ("Jaffe") served as Chief Executive Officer ("CEO"), President and Chairman of the Board of Ascena since 2002.  He retired from his position as CEO and Chairman of the Board on May 1, 2019.  He remains a member of the Board of Directors.  Jaffe is the son of Ascena co-founders Elliot and Roslyn Jaffe.

18.    Defendant Robert Giammatteo ("Giammatteo") served as Chief Financial Officer ("CFO") and Executive Vice President ("EVP") of Ascena from February 11, 2015, through July 25, 2019.  Giammatteo joined Ascena in September 2013 as its Senior Vice President of Financial Planning and Analysis and Investor Relations.

19.    Defendants Jaffe and Giammatteo are referred to herein as the "Individual Defendants."  Ascena and the Individual Defendants are referred to herein, collectively, as the "Defendants."

20.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Ascena, were privy to confidential and proprietary information concerning Ascena and its operations, finances, financial condition, and present and future business prospects.   As discussed below, the Individual Defendants had access to material, adverse, non-public information concerning Ascena via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.   Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.   In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.   Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Ascena's business.

22.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ Global Select Market and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Ascena's financial condition and performance, growth, operations, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Ascena common stock would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     Each Defendant is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Ascena common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme deceived the investing public regarding Ascena's business and prospects and the intrinsic value of Ascena common stock and caused Lead Plaintiffs and other members of the Class (defined below) to purchase Ascena common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

25.     Ascena describes itself as a leading national specialty retailer of apparel for women and tween girls.   The Company operates, through its 100% owned subsidiaries, ecommerce operations and approximately 4,800 stores in the United States, Canada and Puerto Rico, as of the end of its 2017 fiscal year, which ended July 29, 2017.[1]   The Company focuses on cornering niche markets, such as fashion for pre-adolescent girls or plus-size women, and sells its products exclusively at its own brick-and-mortar stores or online platforms.

---

[1]     Unlike other companies that conform their fiscal year to the Gregorian calendar (*i.e.*, January 1 through December 31), Ascena utilizes a 52-53 week fiscal year ending on the last Saturday in July.

26.     Ascena's predecessor company, The Dress Barn, Inc., was founded in 1962 in Stamford, Connecticut, by Roslyn and Elliot Jaffe – the parents of defendant Jaffe – and was intended to provide wear-to-work clothing for the working woman during a time when more women were entering the workforce and there were few options for affordable wear-to-work women's attire.

27.     Defendant Jaffe spent over a decade in the private equity field before joining the family business.  In 1992, Jaffe joined the Company as a Vice President and ultimately replaced his father as President and CEO in 2002.  During his time in private equity,[2] Jaffe described himself as an investor who would "spend[] time trying to acquire businesses that would work" noting that he "would sit on boards, so it was all very strategic."[3]  Defendant Jaffe earned his undergraduate degree from the Wharton School of Business at the University of Pennsylvania and obtained an M.B.A from the Stanford Graduate School of Business before his private equity career.

---

[2]     According to Investopdia.com, "[p]rivate equity firms mostly buy mature companies that are already established.  The companies may be deteriorating or not making the profits they should be due to inefficiency.  Private equity firms buy these companies and streamline operations to increase revenues."

[3]     Robin Lewis, *Q&A With David Jaffe*, THE ROBIN REPORT (Mar. 21, 2016), https://www.therobinreport.com/qa-with-david-jaffe/.

28.    Under Jaffe's control, The Dress Barn, Inc. reorganized in 2011, becoming Ascena Retail, Inc.   Under the terms of the restructuring agreement, Ascena would serve as the parent-holding company for the Company's operating brands and each of the retail operating brands became subsidiaries of Ascena.

29.    Determined to grow his parents' business into an empire, Jaffe essentially turned the Company into his own private equity firm, setting out on an acquisition shopping spree.   From 2005 through 2015, Ascena embarked upon a decade-long acquisition binge, expanding its portfolio to include brands whose target customers are girls and women outside Dress Barn's target demographic – middle-aged women seeking low-to-mid-priced workplace fashion.

30.    In 2005, Ascena, then The Dress Barn, Inc., acquired Maurices in a deal valued at $320 million.   Maurices offers women's casual clothing, career wear, dressy apparel, active wear and accessories targeted at core and plus-sized women.

31.    Then, in November 2009, Ascena acquired Tween Brands, Inc., which operates under the store name Justice.  Justice's target customer is tween girls ages six to twelve and offers a mix of apparel, accessories, footwear, intimates and lifestyle products, such as cosmetics and bedroom furnishings.   The Justice acquisition deal was valued at $256 million.

32.    In 2012, Ascena expanded its portfolio once again, pushing further into the female plus-sized clothing industry when it acquired the parent company of Lane

Bryant and Catherines for a deal valued at $849 million.  These brands offer wear-to-work apparel, sportswear, intimate apparel, accessories, select footwear and social occasion apparel at a moderate price point to female customers in plus-sizes.

### Ascena Acquires ANN Inc.

33.    With this expansion-driven strategy in place, Jaffe sought to expand the Company's horizons further by breaking into the premium fashion business.  Unlike Ascena's other brands that offered modestly-priced clothing and accessories, ANN brands focus on delivering premium fashion-forward clothing aimed at affluent female buyers in the age group of 25-50 years, primarily under the Ann Taylor and LOFT brands.  ANN is the parent company of Ann Taylor and LOFT and as of January 31, 2015, operated 1,030 Ann Taylor, Ann Taylor Factory, LOFT Outlet and other stores in forty-seven (47) states, the District of Columbia, Puerto Rico and Canada.

34.    Ann Taylor was founded in 1954, in New Haven, Connecticut and was geared towards dressing the modern, stylish American woman.  Since then, Ann Taylor has expanded, becoming a franchise with stores nation-wide.  LOFT, on the other hand, was created in 1998 and has a younger, more casual feel to its clothing and accessory line.

35.     On May 18, 2015, Ascena issued a press release announcing that it had entered into a definitive merger agreement with ANN, under which Ascena would acquire ANN for a combination of cash and stock (the "ANN Acquisition").

36.     According to the May 18, 2015 press release, ANN stockholders would receive $37.34 in cash and 0.68 shares of Ascena common stock in exchange for each share of ANN common stock.  Upon closing, ANN's former stockholders would own approximately 16% of Ascena.

37.     Market analysts were surprised by the announcement and some wondered whether the ANN Acquisition was the right move for the Company.  On May 18, 2015, analyst Steven Marotta of CL King wrote "[w]e are a bit surprised at the timing and scope of this acquisition. . . . As ANN will increase ASNA's revenue base by more than 50%, *any hiccups similar to the last transaction will undoubtedly act as a multiple contractor to ASNA's valuation*."

38.     In order to pay for the ANN Acquisition, Ascena chose to leverage itself with a level of debt unprecedented for the Company.  The August 21, 2015 press release announced that Ascena was forced to "finance the cash portion of the acquisition through a $1.8 billion senior secured term loan it placed on July 29, 2015."

39.     Following the ANN Acquisition, the Company was now the largest US-based specialty apparel retailer focused exclusively on the female consumer.

40.     After the ANN Acquisition, the Company recorded $959.6 million of goodwill, of which $733.9 million was assigned to Ascena's ANN reporting unit and the remaining $225.7 million balance of goodwill being allocated to other Ascena reporting units based upon anticipated procurement, fulfillment, distribution and shared services cost savings in those reporting units resulting from the acquisition. At issue in this case is the billions of dollars of goodwill and other intangible assets assigned to the ANN reporting unit.

### Financial Reporting Standards for Intangible Assets

41.     Generally Accepted Accounting Principles ("GAAP"), in Accounting Standards Codification ("ASC") Topic No. 350, *Intangibles - Goodwill and Other*, define goodwill as an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized.[4]  In addition, ASC Topic No. 350 defines intangible assets as non-financial assets lacking physical substance other than goodwill.

42.     Pursuant to ASC Topic No. 350, goodwill is to be tested for impairment annually and on an interim basis when events and circumstances may indicate that the carrying amount of goodwill, *i.e.*, the amount reflected in the financial

---

[4]     The Financial Accounting Standards Board ASC is the source of authoritative GAAP to be applied by nongovernmental entities.

statements, is impaired.  ASC Topic No. 350 provides examples of events and circumstances that may indicate goodwill is impaired, including:

(a)   Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;

(b)   Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics, a change in the market for an entity's products or services, or a regulatory or political development;

(c)   Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;

(d)   Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods;

(e)   Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation;

(f)   Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, the testing for

recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit; and

> (g)   A sustained decrease in share price (consider in both absolute terms and relative to peers).

43.   Goodwill is considered to be impaired when the carrying amount (*i.e.*, the amount reported on a company's balance sheet) of a reporting unit exceeds its fair value.[5]  The amount of the goodwill impairment is the amount that the carrying amount of a reporting unit exceeds its fair value.  In other words, the goodwill impairment charge = carrying amount – fair value

44.   With respect to intangible assets other than goodwill, the accounting for impairment depends on the asset's useful life.  An intangible asset with a finite useful life is to be amortized, while intangible assets with infinite useful lives, *i.e.*, the Ann Taylor and LOFT trade names at issue in this case, are to be tested for impairment annually and more frequently if events or changes in circumstances indicate that it is more likely than not that the asset is impaired.

---

[5]   The fair value of a reporting unit refers to the price that would be received to sell the unit as a whole in a transaction.  Quoted market prices in active markets are the best evidence of fair value and should be used as the basis for the measurement, if available.

45.     Pursuant to ASC Topic No. 350, a qualitative assessment may be performed to determine whether it is necessary to perform the quantitative impairment test for infinite life intangible assets.  A company may bypass the qualitative assessment for any indefinite life intangible asset and proceed directly to performing the quantitative impairment test.  When electing to perform a qualitative assessment, qualitative factors should be assessed to determine whether it is more likely than not (*i.e.*, a likelihood of more than 50%) that an indefinite life intangible asset is impaired.

46.     If after assessing the totality of events and circumstances and their potential effect on the significant inputs used to determine the fair value of indefinite life intangible assets, an entity determines that:

- It is not more likely than not that the indefinite life intangible asset is impaired, then the entity need not calculate the fair value of the intangible asset and perform the quantitative impairment test; or

- It is more likely than not that the indefinite life intangible asset is impaired, then the entity should calculate the fair value of the intangible asset and perform the quantitative impairment test.

47.     All relevant events and circumstances that could affect the significant inputs used to determine the fair value of the indefinite life intangible asset should be reviewed including:

(a)     Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on future expected earnings and cash flows that

- 17 -

could affect significant inputs used to determine the fair value of the indefinite life intangible asset;

(b)    Financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods that could affect significant inputs used to determine the fair value of the indefinite life intangible asset;

(c)    Legal, regulatory, contractual, political, business, or other factors, including asset-specific factors that could affect significant inputs used to determine the fair value of the indefinite life intangible asset;

(d)    Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation that could affect significant inputs used to determine the fair value of the indefinite life intangible asset;

(e)    Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (in both absolute terms and relative to peers), or a change in the market for an entity's products or services due to the effects of obsolescence, demand, competition, or other economic factors (such as the stability of the industry, known technological advances, legislative action that results in an uncertain or changing business environment, and expected changes in

distribution channels) that could affect significant inputs used to determine the fair value of the indefinite life intangible asset; and

(f)    Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets that could affect significant inputs used to determine the fair value of the indefinite life intangible asset.

48.    An entity also should consider the following to determine whether it is more likely than not that the indefinite life intangible asset is impaired:

(a)    Positive and mitigating events and circumstances that could affect the significant inputs used to determine the fair value of the indefinite life intangible asset;

(b)    If an entity has made a recent fair value calculation for an indefinite life intangible asset, the difference between that fair value and the then carrying amount; and

(c)    Whether there have been any changes to the carrying amount of the indefinite life intangible asset.

49.    The quantitative impairment test for an indefinite life intangible asset consists of a comparison of the fair value of the asset with its carrying amount.  If

the carrying amount of an intangible asset exceeds its fair value, an impairment loss should be recognized in an amount equal to that excess.

50.     During the Class Period, Ascena was required to follow the guidance of ASC Topic No. 350 in accounting for its goodwill, including the goodwill it recorded from the ANN Acquisition and its indefinite life intangible assets, including its Ann Taylor and LOFT trade names.

### ANN's Sales Experience a Sustained Downturn and Defendants Improperly Delayed Recognizing an Impairment Charge on ANN's Goodwill and Trade Name

51.     Throughout the Class Period, ANN experienced a significant deterioration in the key metrics underlying the value of its goodwill and other intangible assets.  Defendants were aware of this deterioration, which included declining sales and store traffic, declining comparable sales, a shift in consumer spending, and a drastically altered competitive environment, as well as a steady decline in the Company's stock price and market capitalization.

52.     Defendants knew that a shift in consumer spending habits towards shopping online, as opposed to in traditional brick-and-mortar retail stores, was adversely affecting store traffic.  The decline in store traffic, in turn, generated a decline in comparable sales – an important metric to which investors and analysts are acutely attuned.  To offset the decline in store traffic, the Company was forced

to increase its promotional operating environment, *i.e.*, more heavily discount its products, which in turn, reduced the Company's margins and profitability.

53.    The below excerpt from a May 7, 2017 analyst report published by KeyBanc shows that by the time the Class Period began, the Company's ANN brands – Ann Taylor and LOFT – were already experiencing a downward trend in comparable store sales growth.[6]  Indeed, as reflected in the chart below, the decline in ANN brands' sales continued to steepen throughout the Class Period, particularly in the flagship Ann Taylor division.

### Exhibit 1: Comps by banner

| Comp | 2Q15 | 3Q15 | 4Q15 | 1Q16 | 2Q16 | 3Q16 | 4Q16 | 1Q17 | 2Q17 |
|---|---|---|---|---|---|---|---|---|---|
| Consolidated | 1% | -1% | -2% | -3% | -5% | -4% | -5% | -5% | -4% |
| Justice | -6% | -12% | -17% | -15% | -17% | -11% | -4% | -1% | -1% |
| Lane Bryant | 1% | 4% | 3% | 4% | 2% | -1% | 1% | -4% | -5% |
| maurices | 8% | 6% | 8% | 7% | 0% | -6% | -9% | -6% | -8% |
| dressbarn | 2% | -4% | -3% | -5% | -4% | -2% | -7% | -5% | -3% |
| Catherines | 9% | 4% | 3% | -1% | -3% | -8% | -5% | -10% | 0% |
| Ann Taylor | 0% | -3% | -2% | -4% | -7% | -5% | -12% | -11% | -9% |
| LOFT | 2% | -1% | -2% | -1% | 1% | 2% | -2% | -3% | -2% |

*Source: Company reports, transcripts and KeyBanc Capital Markets Inc.*
*NOTE: Consolidated comp includes Ann Taylor and LOFT as of 3Q16.*

54.    The significant weakening of Ascena's business was reflected in Ascena's stock price – another important indicator of potential impairment – that

---

[6]    Ascena generally defines comparable store sales as the change in sales of stores open in a given period as compared to same calendar period in the prior year and ecommerce comparable sales as the change in sales from the Company's ecommerce channel in the current period as compared to the same calendar period in the prior year.  Ascena's reported comparable sales combined both store and ecommerce sales.

declined significantly during the Class Period.  The following chart reflects the price of Ascena's stock during the Class Period:



Source: https://finance.yahoo.com/

55.    When the Company finally announced the $1.3 billion impairment charge, the Company justified the timing on the ostensible basis that, given the Company's lower-than-expected performance and sustained challenging retail environment, the Company was required to lower the projections used in testing its intangible asset valuation.  In particular, the Company explained that it significantly lowered its sales growth assumptions to reflect the uncertainty of future comparable sales given the dynamic change in the Company's retail sector, resulting in a significant reduction in fair market value of the goodwill assigned to Ascena's ANN

reporting unit and the Ann Taylor and LOFT trade names.  This explanation is not credible.  The market realities underlying these changed projections did not suddenly occur.  Rather, as the Company's CFO has admitted, the change in the projections underlying the Company's ANN valuation represented "***a significant change in the market environment we've seen over the past couple of years***."

56.     As a result, the Class Period financial statements issued by Defendants were presented in violation of GAAP, included materially misleading representations about Ascena's accounting policies and procedures; materially overstated the Company's assets, materially understated the Company's expenses, and materially overstated Ascena's pre-tax income.

57.     While investors may have had access to information disclosed by the Company concerning its slumping sales figures or deteriorating business, they could not have been aware that the Company was artificially inflating its goodwill and trade name.  To the contrary, by repeatedly announcing to the marketplace that the value of ANN's goodwill and other intangible assets remained unchanged throughout the Class Period, Defendants downplayed the Company's problems and falsely reassured investors that, despite these difficulties, the ANN brands remained strong.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## MADE DURING THE CLASS PERIOD

**1Q16 Financial Results**

58.    The Class Period begins on December 1, 2015, when Ascena filed a

Form 10-Q with the SEC for the quarter ended October 24, 2015 (the "1Q16 10-Q"),

which was signed by Defendants Jaffe and Giammatteo.  In the Form 10-Q, the

Company reported that its goodwill was valued at $1.273 billion.  As to the ANN

Acquisition, Ascena attributed $953.2 million to goodwill and $815 million to trade

names.  The Company also announced a net loss of $0.10 per diluted share.

59.    The 1Q16 10-Q described the method by which it calculated the value

of ANN's trade names, primarily, Ann Taylor and Loft, stating in pertinent part:

> The values assigned to the Ann Taylor and LOFT trade names were
> derived using the relief-from-royalties method under the income
> approach. . . . The Ann Taylor and LOFT trade names are deemed to
> have indefinite lives and are not amortized but subject to an impairment
> assessment annually, or more frequently if events or changes in
> circumstances indicate that the asset may be impaired.

60.    The 1Q16 10-Q also explained that, to the extent that the amount that

Ascena paid for ANN was greater than the amount that ANN's assets were actually

worth, Ascena would contribute that excess amount to the Company's goodwill and

report it as goodwill on Ascena's balance sheet as follows:

> The Company accounted for the ANN Acquisition under the
> acquisition method of accounting for business combinations.
> Accordingly, the cost to acquire such assets was allocated to the
> underlying net assets in proportion to estimates of their respective fair

values.  The excess of the purchase price over the estimated fair value of the net assets acquired was recorded as goodwill, which consists largely of the synergies and economies of scales expected from integrating ANN's operations.  Goodwill is non-deductible for income tax purposes.  Given the close proximity of the closing date of the acquisition to the end of the Company's current fiscal quarter, the allocation of the purchase price to the assets acquired and liabilities assumed, including the amount allocated to goodwill, is based upon preliminary information and is subject to change within the measurement period (up to one year from the acquisition date) as additional information that existed at the date of the acquisition related to the values of assets acquired and liabilities assumed is obtained.  The Company expects to finalize the allocation of the purchase price to the assets acquired and liabilities assumed by the spring of 2016, particularly as it relates to the valuation of ANN's numerous leases.

61.     The statements referenced above in ¶¶58-60 were materially false and misleading when made because Defendants knew but failed to disclose that ANN brands' declining performance indicated that the Company's goodwill and intangible assets were being carried at artificially inflated values and that an impairment charge was necessary to accurately reflect the value of ANN's goodwill and other intangible assets, which in turn, made the Company appear more profitable than it actually was.

62.     Defendants either knew or recklessly disregarded that the decline in ANN's sales and financial performance indicated that an impairment analysis was necessary.  Indeed, that same day Defendant Jaffe confirmed that sales for the ANN brand were suffering during the conference call that Company hosted for analysts and investors to discuss the quarter's results.  The Individual Defendants participated

in the call.  Defendant Jaffe commented on ANN's declining revenues, stating in

pertinent part as follows:

> ***Ann Taylor brand comp sales were down 4% with Ann Taylor down
> 1% inclusive of full-price stores and Ann Taylor.com and Ann
> Taylor's factory stores were down 8%***.  Average selling price was up
> 9% to last year as we successfully pulled back from all store entire
> purchase promotions, reduced the offer depth on category level
> promotions and aggressively managed down inventory.

63.     With respect to the financial statements contained therein, the 1Q16 10-

Q represented the following:

> These interim condensed consolidated financial statements have been
> prepared pursuant to the rules and regulations of the Securities and
> Exchange Commission (the "SEC") and are unaudited.  In the opinion
> of management, however, such condensed consolidated financial
> statements contain all normal and recurring adjustments necessary to
> present fairly the condensed consolidated financial condition, results of
> operations, comprehensive (loss) income and cash flows of the
> Company for the interim periods presented.  In addition, certain
> information and footnote disclosures normally included in financial
> statements prepared in accordance with the accounting principles
> generally accepted in the U.S. ("US GAAP") have been condensed or
> omitted from this report as is permitted by the SEC's rules and
> regulations.  However, the Company believes that the disclosures
> herein are adequate to ensure that the information is fairly presented.

64.     The statements referenced above in ¶63 were materially false and

misleading when made because, in violation of GAAP, Defendants knowingly or

recklessly caused Ascena to issue the Class Period financial statements that:

(i) included materially misleading representations of fact about Ascena's policies of

accounting for goodwill and other intangible assets; and (ii) materially overstated

the Company's assets and understated the Company's expenses, which resulted in a concomitant overstatement of Ascena's pre-tax income.

**2Q16 Financial Results**

65.    On March 1, 2016, Ascena filed a Form 10-Q for the period January 23, 2016 (the "2Q16 10-Q"), with the SEC which was signed by Defendants Jaffe and Giammatteo.  The Company reported that its goodwill was valued at $1.268 billion and the net value of its other intangible assets was $1.283 billion.  The Company also announced a net loss of $0.12 per diluted share.

66.    With respect to the goodwill attributed to the ANN Acquisition, the Form 10-Q explained that, to the extent that the amount that Ascena paid for ANN was greater than the amount that ANN's assets were actually worth, Ascena would contribute that excess amount to the Company's goodwill and report it as goodwill on Ascena's balance sheet as follows:

> The Company accounted for the ANN Acquisition under the acquisition method of accounting for business combinations. Accordingly, the cost to acquire such assets was allocated to the underlying net assets in proportion to estimates of their respective fair values.  The excess of the purchase price over the estimated fair value of the net assets acquired was recorded as goodwill, which consists largely of the synergies and economies of scale expected from integrating ANN's operations. Goodwill is non-deductible for income tax purposes.
>
> The allocation of the purchase price to the assets acquired and liabilities assumed, including the amount allocated to goodwill, is subject to change within the measurement period (up to one year from the acquisition date) as additional information that existed at the date of the

acquisition related to the values of assets acquired and liabilities assumed is obtained.  During the second quarter of Fiscal 2016, the Company recorded measurement-period adjustments which were not material to the condensed consolidated financial statements, as more fully described in the table below.  The Company is currently in the process of finalizing the allocation of the purchase price to the assets acquired and liabilities assumed and does not expect any changes to be material.

67.    The statements referenced above in ¶¶65-66 were materially false and misleading when made because Defendants knew but failed to disclose that ANN's deteriorating performance indicated that the Company's goodwill and intangible assets were being carried at artificially inflated values and that an impairment charge was necessary to accurately reflect the value of ANN's goodwill and other intangible assets, which in turn, made the Company appear more profitable than it actually was.

68.    On March 1, 2016, Ascena also hosted a conference call with analysts and investors to discuss its third quarter fiscal results and confirmed that Ascena's sales continued to decline.  The Individual Defendants participated in the call. Defendant Jaffe stated:

> We were not immune to the macro specialty retail environment, which was adversely impacted by soft traffic and the late onset of seasonal weather, and we would've certainly liked to have seen stronger selling during the holiday period.  Excluding Justice, where negative double-digit comps were planned, Ascena comp performance was down 1% for the quarter.

69.    With respect to the financial statements contained therein, the 2Q16 10-Q represented the following:

These interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited.  In the opinion of management, however, such condensed consolidated financial statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of operations, comprehensive (loss) income and cash flows of the Company for the interim periods presented.  In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with the accounting principles generally accepted in the U.S. ("US GAAP") have been condensed or omitted from this report as is permitted by the SEC's rules and regulations.  However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

70.     The statements referenced above in ¶69 were materially false and misleading when made because, in violation of GAAP, Defendants knowingly or recklessly caused Ascena to issue the Class Period financial statements that: (i) included materially misleading representations of fact about Ascena's policies of accounting for goodwill and other intangible assets; and (ii) materially overstated the Company's assets and understated the Company's expenses, which resulted in a concomitant overstatement of Ascena's pre-tax income.

**3Q16 Financial Results**

71.     On May 31, 2016, Ascena filed a Form 10-Q with the SEC for the quarter ending April 23, 2016 ("3Q16 10-Q"), which was signed by Defendants Jaffe and Giammatteo.  For the quarter, the Company reported its goodwill as $1.268 billion and the net value of its other intangible assets as $1.275 billion.  In the Form 10-Q, the assessment on goodwill relating to ANN as of April 23, 2016, was $948.2

million, a decrease from the prior quarter of $0.1 million, and a total decrease of $5 million from the acquisition date.  The Company also announced earnings of $0.08 per diluted share compared to earnings of $0.15 per diluted share in the same period of Fiscal 2015.

72.    The statements referenced above in ¶72 were materially false and misleading when made because Defendants knew but failed to disclose that ANN's deteriorating performance indicated that the Company's goodwill and intangible assets were being carried at artificially inflated values and that an impairment charge was necessary to accurately reflect the value of ANN's goodwill and other intangible assets, which in turn, made the Company appear more profitable than it actually was.

73.    Defendants knowledge of the Company's deteriorating performance is demonstrated by their own statements concerning the financial results reported in the 3Q16 10-Q.  For example, Ascena issued a press release the same day that it filed its Form 10-Q, noting that the Company continued to struggle with its declining store traffic and sales.  Defendant Jaffe commented on the results stating in pertinent part as follows:

> *. . . [T]he environment this Spring has been challenging. After the disruption of a warm holiday season, we've had to contend with an unseasonably cold spring and resulting elevated traffic headwinds.* While I think we have managed the business well, particularly with respect to inventory levels, *we were not able to fully mitigate these challenges.*  Our earnings exceeded the upper end of our guidance range for the third quarter, but I'll note that performance benefited from some favorable expense timing that offset softer than expected top-line

performance.  These expenses will come back in the fourth quarter, and combined with the traffic challenges we've seen continue through May, we've adjusted our earnings outlook downward.

74.     Similarly, that same day, Ascena held a conference call with analysts and investors to discuss the Company earnings and operations.  The Individual Defendants participated in the call.  During the conference call, defendant Jaffe confirmed that the Company's declining revenue was expected to continue further, requiring Ascena to revise its projected earnings, stating "[b]ased on the soft traffic we've seen continue through May, we've adjusted our earnings outlook downward."

75.     Likewise, during the call defendant Giammatteo explained that traffic in the brick-and-mortar stores continued to struggle, which adversely effected the Company's overall revenue, stating as follows:

> Net sales of $1.67 billion for the third quarter were down 4% to last year, in line with comp sales.  Excluding the planned decline at Justice, Ascena comp sales were down 2%.  Selling trends turned negative due to unseasonably cool weather that emerged mid-quarter, with total Company comp performance up 2% for the first eight weeks of the quarter and down 10% for the last five weeks of the quarter.  The change in comp trends was caused primarily by store traffic, which slowed significantly mid-quarter. For the quarter, store traffic was down 9%.

> *     *     *

> So if you think about how March and April shook out, April turned out to be very, very challenging from a traffic standpoint.

> And instead of applying markdowns into low traffic periods, which is generally not productive, some of the brands held markdowns for Memorial Day and loaded up more heavily.  So brands like Justice,

Lane Bryant, specifically, did not execute some planned markdowns in the end of the third quarter to hold for Memorial Day.

76.    In response to a question from Oppenheimer analyst, Anna Andreeva, asking whether the Company was expecting its "down 2 to 3% comp guidance" to continue, defendant Giammatteo confirmed that the downward sales trend was expected to continue, stating:

> So your question was in May, what was the trend like and how are we looking at it going forward. As I said, May was generally in line with how April was. The same malaise we saw in April generally existed into May, and Memorial Day, matching this year last year, was the first period where we've seen things snap back to where we expected them to be, which was generally flat year on year during the Memorial Day period on a shifted basis. So again, we had a challenging month of May that was generally in line with April. We expect June and July to generally be in the line of negative low single digits that would blend us out to that negative 2 to negative 3 for the full quarter.

77.    With respect to the financial statements contained therein, the 3Q16 10-Q represented the following:

> These interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited. In the opinion of management, however, such condensed consolidated financial statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of operations, comprehensive (loss) and cash flows of the Company for the interim periods presented. In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with the accounting principles generally accepted in the U.S. ("US GAAP") have been condensed or omitted from this report as is permitted by the SEC's rules and regulations. However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

78.     The statements referenced above in ¶77 were materially false and misleading when made because, in violation of GAAP, Defendants knowingly or recklessly caused Ascena to issue the Class Period financial statements that: (i) included materially misleading representations of fact about Ascena's policies of accounting for goodwill and other intangible assets; and (ii) materially overstated the Company's assets and understated the Company's expenses, which resulted in a concomitant overstatement of Ascena's pre-tax income.

**FY 2016 Financial Results**

79.     On September 19, 2016, the Company filed its annual financial report on Form 10-K for the fiscal year ended July 30, 2016 (the "2016 10-K"). The Individual Defendants signed the 2016 10-K.

80.     The Form 10-K reported that the Company valued its goodwill at $1.279 billion and the net value of its intangible assets at $1.268 billion. The Company also reported earnings of $0.07 per diluted share for the fourth quarter of Fiscal 2016 and a GAAP loss of $0.06 per diluted share for the full year Fiscal 2016.

81.     The Form 10-K reported ANN's goodwill in the amount of $733.9 million, which was a reduction of $225.7 million since the Company issued its prior quarterly financial report for the period ended April 23, 2016. According to the 2016 10-K, Ascena assigned this amount to other reporting units after they completed "an analysis of the expected synergies."

82.     Ascena explained that, to the extent that the amount that Ascena paid for ANN exceeded the amount that ANN's assets were worth, Ascena would report that excess amount as goodwill on Ascena's balance sheet.   The 2016 10-K explained as follows:

> The Company accounted for the ANN Acquisition under the acquisition method of accounting for business combinations. Accordingly, the cost to acquire such assets was allocated to the underlying net assets in proportion to estimates of their respective fair values.  The excess of the purchase price over the estimated fair value of the net assets acquired was recorded as goodwill, which consists largely of the synergies and economies of scale expected from integrating ANN's operations.  The Company allocated $225.7 million of the goodwill related to the ANN Acquisition to the Company's other reporting units where the anticipated benefits of the acquisition are expected to be achieved[.]
>
> The allocation of the purchase price to the assets acquired and liabilities assumed, including the amount allocated to goodwill, was subject to change within the measurement period (up to one year from the acquisition date) as additional information that existed at the date of the acquisition related to the values of assets acquired and liabilities assumed is obtained.   During Fiscal 2016, the Company recorded certain measurement-period adjustments.   While no material adjustments are expected, the purchase price allocation is not yet final as the Company is completing its analysis of the opening balances related to deferred taxes.  The allocation will be finalized during the first quarter of Fiscal 2017.

83.     In the Notes to the Consolidated Financial Statements, the 2016 10-K disclosed that the Company tests its goodwill and indefinite-lived intangible assets annually and that for fiscal year 2016, the Company would not be taking any impairment charges, stating in pertinent part:

As discussed in Note 3, the Company performs its annual impairment assessment of goodwill and indefinite-lived intangible assets during the fourth quarter of each fiscal year.   The impairment test for other indefinite-lived intangible assets consists of a comparison of the fair value of the intangible asset with its carrying value.   If the carrying value of the indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized equal to the excess.  ***Based on the results of the Company's annual impairment testing of goodwill and indefinite-lived intangible assets for Fiscal 2016, no impairment charges were deemed necessary.***

84.   Under the heading "Impairment to the carrying value of our goodwill or other intangible assets could result in significant non-cash charges" the Company described the circumstances under which Ascena's goodwill could be impaired as follows:

As described in Note 6 to the accompanying consolidated financial statements included elsewhere herein, as of July 30, 2016, we had approximately $2.5 billion of goodwill and other intangible assets related to the acquisitions of maurices in January 2005, Tween Brands in November 2009, Lane Bryant and Catherines in June 2012 and ANN in August 2015.  ***Current and future economic conditions, as well as the other risks noted in this Item 1A, may adversely impact our brands' ability to attract new customers, retain existing customers, maintain sales volumes and maintain margins.***  As discussed in our Critical Accounting Policies included elsewhere herein, ***these events could materially reduce our brands' profitability and cash flow which could, in turn, lead to a further impairment of our goodwill and other intangible assets***, in addition to the impairment losses of $306.4 million recorded during Fiscal 2015 to write down the carrying value of Lane Bryant's goodwill and intangible asset to their fair values. ***Furthermore, significant negative industry or general economic trends, disruptions to our business and unexpected significant changes or planned changes in our use of the assets may result in additional impairments to our goodwill, intangible assets and other long-lived assets.  Any impairment could have a material effect on our operational results and financial condition.***

85.     Despite having these standards and controls in place, the 2016 10-K reported that ANN's goodwill was being carried at a value that did not exceed ANN's fair value.  In other words, the Company reported that ANN's goodwill was *not* impaired:

> During the fourth quarter of Fiscal 2016, the Company performed its annual impairment assessment (the "Fiscal 2016 Valuation").  While the fair values of Justice, maurices and Catherines were all significantly in excess of their respective book values, the fair value of the Company's Lane Bryant and ANN reporting units exceeded their book value by less than 20% . . . .

86.     In fact, the 2016 10-K misleadingly reported that ANN's fair value actually *exceeded* the amount that Ascena was carrying on its balance sheet, stating as follows:

> For the newly acquired ANN business, the Fiscal 2016 Valuation indicated that its fair value exceeded its carrying value by approximately 12%.

> Significant assumptions underlying the discounted cash flows included: a [weighted average cost of capital] rate of 11.5% which was determined from relevant market comparisons and adjusted for specific risks; operating income margin of mid-to-high single digits and a terminal growth rate of 2%.  Material changes in these assumptions could have a significant impact on the valuation model. . . .

> Additionally, if we experience sustained periods of unexpected changes in consumer spending or are unable to realize the significant amount of synergies expected from the acquisition, it could adversely impact the long-term assumptions used in our Fiscal 2016 Valuation.  Such trends may have a negative impact on some of the other key assumptions used in the Fiscal 2016 Valuation, including anticipated gross margin and operating income margin as well as the WACC rate.  These assumptions are highly judgmental and subject to change.  Such changes, if material, may require us to incur impairment charges for

goodwill and/or other indefinite-lived intangible assets in future periods.

87.   Finally the 2016 10-K purported to warn that "declining store traffic" could impact the Company's profitability, while neglecting to disclose that Ascena was *already* facing adverse changes to its "business, operational results, financial position and cash flows" that caused the Company to overvalue its goodwill and other intangible assets, stating in relevant part:

> . . . . Maintaining, promoting and growing our brands will depend largely on the success of our design, merchandising and marketing efforts and our ability to provide a consistent, high-quality customer experience.  In addition, while most of our brands are mature and we have extensive customer lists, our success depends, in part, on our ability to keep existing customers while engaging and attracting new customers to shop our brands.  Our business and results of operations could be adversely affected if we fail to achieve these objectives for any of our brands and failure to achieve consistent, positive performance at several of our brands simultaneously could have an adverse effect on our sales and profitability.   In addition, ***our ability to address the challenges of declining store traffic, including at strip shopping centers, shopping malls, outlet centers and other retail centers, in a highly promotional, low growth environment may impact our ability to maintain and gain market share and also impact our business, operational results, financial position and cash flows.***

88.   The statements referenced above in ¶¶80-87 were materially false and misleading when made because Defendants knew but failed to disclose that ANN's deteriorating performance indicated that the Company's goodwill and intangible assets were being carried at artificially inflated prices, which in turn, made the Company appear more profitable than it actually was.

89.   The Company's declining performance was further confirmed when defendant Jaffe spoke about the Company's financial results and the ANN integration in a press release that the Company published that same day, stating in pertinent part:

> Fiscal 2016 was a challenging year for Ascena characterized by a highly competitive selling environment and significant store traffic headwinds.  While we are seeing good customer demand during peak periods, off-peak demand has been inconsistent, and fourth quarter financial performance fell well below our expectations.

90.   The Individual Defendants, who participated in the call, further confirmed this decline during the conference call Ascena hosted that same day for analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants reduced earnings guidance for the Company and made other statements about the condition of the Company's business.  Defendant Jaffe again noted that "FY16 was a challenging year" and that "May was a particularly difficult month, with comp sales and store traffic down double digits.  Store traffic improved modestly over the June/July period, but remained down high-single digits."  He also commented on the then-current fiscal quarter:

> [O]ur customer remains inconsistent. She's out shopping during periods of need, but is increasingly difficult to convert during non-peak periods without a significant pricing message.  Price has become an increasingly important dimension on the value equation, and our brands are evaluating opening price point strategies to mitigate traffic headwinds while maintaining pricing integrity with our customer. . . .

Our fall assortment is checking in most areas, and we do not believe we have any major fashion gaps. That said, our comp performance remains negative and we are managing the Business on a conservative footing from an inventory standpoint until we see signs of conviction from our customer.

91.    Defendant Jaffe also commented on Ann Taylor's disappointing financial results, as follows:

Ann Taylor comp sales were down 12%, with declines in both the full price and factory channels caused primarily by store traffic which was down high-single digits. As with LOFT, we did not repeat significant promotional activity early in the year-ago quarter, but this benefit was more than offset by soft product acceptance in the full-price channel, particularly in key item categories such as knits, pants, and suiting.

92.    During the call, in response to an analyst's question about "the traffic problems which have been industry-wide" at brick-and-mortar stores, Defendant Jaffe stated:

The second part of your question about the store base, we're really slowing down our new store openings. . . . [W]e are likely to have negative store growth at all of our other brands and overall of course, we expect to have negative store growth in FY17. So we've really raised the hurdle rate on the new store pro formas.

We're really not pushing to open new stores, we're pushing to optimize our existing fleet. So we'll continue to close stores. We'll relocate certain stores to more appropriate centers, and we're going to continue to do that on an ongoing basis.

93.    During the call an analyst from JP Morgan asked whether someone could explain the difference between the Company's initially announced earnings and "walk through the delta, where you stand today versus your original expectations

inclusive of the guidance that you're building in for FY17?"   Defendant Jaffe responded as follows:

> It's tough out there.   There's no question that the female apparel shopper has pulled back.  We've all seen the reports, and can't really put our finger on what it is that's brought her back from where she was in terms of her spending.

94.    The 2016 10-K also assured investors that the Company was reporting its financial results in compliance with GAAP as follows:

> The consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"), and present the financial position, operational results, comprehensive (loss) income and cash flows of the Company and its 100% owned subsidiaries.   All significant intercompany balances and transactions have been eliminated in consolidation.

95.    Similarly, in the 2016 10-K Defendants falsely represented that the Company's policies and procedures for accounting for goodwill and other intangible assets conformed with the requirements of GAAP, stating, in pertinent part:

> **_Goodwill and Other Intangible Assets, Net_**
>
> At acquisition, the Company estimates and records the fair value of purchased intangible assets, which primarily consist of certain trade names, customer relationships, favorable leases, proprietary software and franchise rights.   The fair value of these intangible assets is estimated based on management's assessment, considering independent third-party appraisals, when necessary.  The excess of the purchase consideration over the fair value of net assets acquired is recorded as goodwill.
>
> Goodwill and certain other intangible assets deemed to have indefinite useful lives, including trade names and certain franchise rights, are not amortized.  Rather, goodwill and such indefinite-lived intangible assets

are assessed for impairment at least annually based on comparisons of their respective fair values to their carrying values.

Goodwill impairment is determined using a two-step process. The first step of the goodwill impairment test is to identify potential impairment by comparing the fair value of a reporting unit with its net book value (or carrying amount), including goodwill. If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is considered not to be impaired and performance of the second step of the impairment test is unnecessary. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test is performed to measure the amount of impairment loss, if any. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with the carrying amount of that goodwill. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination. That is, the fair value of the reporting unit is allocated to all of the assets and liabilities of that unit (including any unrecognized intangible assets) as if the reporting unit had been acquired in a business combination and the fair value was the purchase price paid to acquire the reporting unit.

The impairment test for other indefinite-lived intangible assets consists of a comparison of the fair value of the intangible asset with its carrying value. The fair value of indefinite-lived intangible assets is primarily determined using the relief-from-royalty approach. If the carrying value of the indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized equal to the excess. In addition, in evaluating finite-lived intangible assets for recoverability, we use our best estimate of future cash flows expected to result from the use of the asset and eventual disposition. To the extent that estimated future undiscounted net cash flows attributable to the asset are less than the carrying amount, an impairment loss is recognized equal to the difference between the carrying value of such asset and its fair value.

The Company performs its annual impairment assessment of goodwill and indefinite-lived intangible assets using a quantitative approach on the first day of its fourth quarter of each fiscal year.

Finite-lived intangible assets are amortized over their respective estimated useful lives and, along with other long-lived assets (as discussed above), are evaluated for impairment periodically whenever events or changes in circumstances indicate that their related carrying amounts may not be recoverable.  Refer to the Company's accounting policy for long-lived asset impairment as described earlier under the caption "*Property and Equipment, Net*."  [Emphasis in the original.]

96.     The statements referenced above in ¶¶94-95 were materially false and misleading when made because, in violation of GAAP, Defendants knowingly or recklessly caused Ascena to issue the Class Period financial statements that: (i) included materially misleading representations of fact about Ascena's policies of accounting for goodwill and other intangible assets; and (ii) materially overstated the Company's assets and understated the Company's expenses, which resulted in a concomitant overstatement of Ascena's pre-tax income.

97.     In response to these announcements, the price of Ascena stock declined from $8.12 per share on September 19, 2016 to $5.69 per share on September 20, 2016 – a decline of 30% – on extremely heavy trading volume.  Defendants, however, continued to conceal the full extent of the issues with ANN and did not carry out an impairment charge.

**1Q17 Financial Results**

98.     On December 1, 2016, Ascena filed a Form 10-Q with the SEC for the quarter ended October 29, 2016 ("1Q17 10-Q"), which was signed by the Individual Defendants.

99.   The Form 10-Q reported that the Company's goodwill was valued at $1.279 billion and the net value of its other intangible assets was valued at $1.263 billion.  Ascena also announced net income of $0.07 per diluted share.

100.   With respect to the goodwill attributed to the ANN Acquisition, the 1Q17 10-Q stated "[t]here were no measurement-period adjustments recorded during the first quarter of Fiscal 2017 and the allocation of the purchase price is final" and the final goodwill allocation as of October 29, 2016, was $959.6 million and the final trade name allocation as of that date was $815 million.

101.   The statements referenced above in ¶¶99-100 were materially false and misleading when made because Defendants knew but failed to disclose that ANN brands' deteriorating performance indicated that the Company's goodwill and intangible assets were being carried at artificially inflated values and that an impairment charge was necessary to accurately reflect the value of ANN's goodwill and other intangible assets, which in turn, made the Company appear more profitable than it actually was.

102.   With respect to the financial statements contained therein, the 1Q17 10-Q represented the following:

> These interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited.  In the opinion of management, however, such condensed consolidated financial statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of

operations, comprehensive income (loss) and cash flows of the Company for the interim periods presented.  In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP") have been condensed or omitted from this report as permitted by the SEC's rules and regulations.  However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

103.   The statements referenced above in ¶102 were materially false and misleading when made because, in violation of GAAP, Defendants knowingly or recklessly caused Ascena to issue the Class Period financial statements that: (i) included materially misleading representations of fact about Ascena's policies of accounting for goodwill and other intangible assets; and (ii) materially overstated the Company's assets and understated the Company's expenses, which resulted in a concomitant overstatement of Ascena's pre-tax income.

104.   Later that day during the Company hosted a conference call the Company to discuss its quarterly earnings.  The Individual Defendants participated in the call.  During the call, defendant Jaffe stated:

> ***Our performance in the first quarter was again challenged by ongoing store traffic headwinds and increasing customer price sensitivity that our industry has been contending with for multiple seasons.***  While we believe the extraordinary election cycle and warmer weather contributed to lackluster consumer activity, ***ultimately, we were disappointed with our sales performance.***
>
> ***Total Ascena comp sales were down 5% below our run rate in mid September when we issued our FY17 and first quarter guidance.*** Although sales and margin results did not come in as we had hoped, I

am pleased that our efforts delivered first-quarter non-GAAP earnings in the middle of our guidance range.

\*       \*       \*

I'd like to share some segment specifics from our first-quarter performance. ***Comp sales in our premium fashion segment were down 6%.*** . . .

***LOFT's comp sales were down 3% on an 8% store traffic decline, and Ann Taylor comp sales were down 11% on a 13% decline in store traffic.***

\*       \*       \*

While these actions will support our near-term performance, we will also continue to aggressively work on our enterprise transformation to create sustainable performance for the longer term through enhanced customer facing capabilities. ***The tough environment certainly highlights the necessity of the transformation we are executing, and we are working to ensure that Ascena emerges as a strong competitor that can simultaneously drive value to a demanding customer and produce the returns expected by our shareholders.***

105.   Later in the call defendant Giammatteo stated "Comp sales were down 5%, but outperformed an 8% decline in store traffic and a 2% decline in average dollar sale that resulted from increased promotional activity that was needed to offset softer than expected demand."

106.   As defendant Jaffe acknowledged in a press release issued on January 10, 2017:

***We were disappointed by our overall Holiday performance. Outside of discrete peaks during the holiday season, we experienced stronger than expected store traffic headwinds. As a result, we were forced into a more highly promotional stance in order to move through inventory in the face of softer overall consumer demand.*** At this juncture, we

- 45 -

are positioning our full year outlook assuming that the trend we experienced through Holiday continues.  We continue to aggressively work our Change for Growth enterprise transformation, and are focused on expense management opportunities to help us navigate the challenging environment.

**2Q17 Financial Results**

107.   On March 6, 2017, Ascena filed its Form 10-Q for the period ending January 28, 2017 ("2Q17 10-Q"), with the SEC which was signed by Defendants Jaffe and Giammatteo.

108.   The 2Q17 10-Q stated that as of the period ended January 28, 2017, Ascena's goodwill was valued at $1.279 billion and its other intangible assets were valued at $1.27 billion.  Ascena also reported a net income of $0.18 per diluted share.

109.   The statements referenced above in ¶108 were materially false and misleading when made because Defendants knew but failed to disclose that ANN's deteriorating performance indicated that the Company's goodwill and intangible assets were being carried at artificially inflated values and that an impairment charge was necessary to accurately reflect the value of ANN's goodwill and other intangible assets, which in turn, made the Company appear more profitable than it actually was.

110.   With respect to the financial statements contained therein, the 2Q17 10-Q represented the following:

These interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited.  In the opinion of management, however, such condensed consolidated financial

statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of operations, comprehensive loss and cash flows of the Company for the interim periods presented.  In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP") have been condensed or omitted from this report as permitted by the SEC's rules and regulations.  However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

111.   The statements referenced above in ¶110 were materially false and misleading when made because, in violation of GAAP, Defendants knowingly or recklessly caused Ascena to issue the Class Period financial statements that: (i) included materially misleading representations of fact about Ascena's policies of accounting for goodwill and other intangible assets; and (ii) materially overstated the Company's assets and understated the Company's expenses, which resulted in a concomitant overstatement of Ascena's pre-tax income.

112.   In the Company's press release that was issued the same day as the 2Q17 10-Q, defendant Jaffe acknowledged:

> *Reflecting on our second quarter results, we saw a continuation of trends that have been in place for some time.*  While we remain generally pleased with selling performance during peaks, *our base business remained soft due to ongoing store traffic headwinds and overall customer price sensitivity, which have become persistent issues impacting our larger sector.*  While our second quarter comp sales were in line with our guidance, we were forced to be much more promotional than planned to achieve this level of performance.
>
> . . . As I reflect on our strategic position, *we continue to see the disruptive trend toward ecommerce transactions, and the growing*

*influence of online engagement on traditional brick and mortar activity across our sector.* We've invested heavily in our omni-channel platform over a multi-year period, and we continue to aggressively evolve our organization to embrace and serve customers in this new retailing paradigm. Yet, there is much more to do. As part of our Change for Growth transformation work, we are developing advanced analytics and customer experience management capabilities that will enhance our opportunities to drive revenue and margin. We continue to aggressively pursue cost structure opportunities, including refinement of our operating model and our ongoing fleet optimization work. We view these initiatives as critical enablers that will allow us to profitably serve our customers in a highly dynamic sector.

113.   In fact, as defendant Jaffe recognized during the conference call hosted

that same day to discuss the Company's earnings for 2Q17:

*Reflecting on our second-quarter results, we saw a continuation of trends that have been a place for some time.* While we remain generally pleased with selling performance during peaks, *our base business remains soft due to ongoing store traffic headwinds and overall customer price sensitivity, which have become persistent issues impacting our larger sector.* While our second-quarter comp sales were in line with our guide, *we were forced to be much more promotional than planned to achieve this level of performance.*

LOFT comp sales were down 2% on an 8% decline in store traffic. . . . Ann Taylor comp sales were down 9% on an 11% decline store traffic. Comp sales performance improved sequentially from the prior quarter, but we missed customer demand due to a lack of consistent fashion offering across the assortment, as well as limited depth in print pattern and novelty detail.

## THE TRUTH EMERGES

**Ascena Announces that It Will Record an Impairment Charge**

114.   The Class Period ends on May 17, 2017, when Ascena issued a press release announcing that the Company would be undergoing an impairment analysis on its goodwill and intangible assets, stating as follows:

> *The impact of the challenging retail environment, the decline in the Company's stock price, and the reduction in the Company's forecasted earnings represent impairment indicators which required the Company to test its goodwill and indefinite lived intangible assets for impairment during the third quarter.*   The Company is in the process of completing that analysis and expects to record a material non-cash impairment charge of its goodwill and intangible assets during the third quarter; however, the amount of the charge is not able to be quantified at this time.

115.   This was the first time that Defendants finally acknowledged that they had been ignoring all the warning signs indicating that Ascena's goodwill and other intangible assets were being reported at artificially inflated values and that the Company would be required to take a material impairment charge.

116.   In the press release, the Company provided further information indicating the continued deterioration of the Company's performance.  The release informed investors that the Company was revising its third quarter and full year fiscal 2017 sales and earnings outlook.  Defendant Jaffe commented on the revision, stating "***Industry-wide traffic headwinds and a highly elevated promotional environment have persisted at levels significantly above our expectations,***

- 49 -

*resulting in a miss to our third quarter sales and earnings outlook*." The Company announced that it was revising its third quarter and full year fiscal 2017 sales and earnings outlook as follows:

| Period | Comparable Sales | Non-GAAP EPS |
|--------|------------------|--------------|
| Q3 FY17 | Down 8% | $0.04 - $0.06 |
| Full Year FY17 | Down 7% - Down 6% | $0.10 - $0.15 |

117.   Defendant Jaffe commented on the revised earnings stating, "The specialty retail sector is in a period of unprecedented secular change that is disruptive to traditional business models, and we believe operating conditions in our sector are likely to remain challenging for the next 12 to 24 months."

118.   In response to this announcement, the price of Ascena stock dropped from $2.82 per share to $2.06 per share, a decline of 26%, on extremely heavy trading volume.

**Defendants Quantify the Impairment Charge Post-Class Period**

119.   On June 8, 2017, Ascena issued a press release detailing its third quarter financial results. For the first time, investors learned the full extent of the artificial inflation that had existed in ANN's goodwill and trade name. The press release stated that *"[T]he loss in the current quarter includes a non-cash pre-tax impairment charge of $1.324 billion* (after tax impact of $5.22 per diluted share) to write-down a portion of the Company's goodwill and other intangible assets."

- 50 -

120.    That same day, the Company hosted a conference call.  The Individual

Defendants participated in the call.  During the call, defendant Giammatteo admitted

that the facts underlying the Company's impairment charge existed during the of the

Class Period.  Commenting on the quarter's non-GAAP results, he stated as follows:

> One such item for the third quarter was $1.3 billion noncash impairment
> charge related to enterprise goodwill and trade names.  ***This charge
> represents a significant change in the market environment we've seen
> over the past couple of years.***  I will note that it has no impact on our
> operations, ability to service debt, compliance with financial covenants
> or underlying liquidity.

121.    Indeed, defendant Giammatteo conceded that the goodwill write down

was not an overnight phenomenon, but rather, that the downward decline in the

Company's sales had been leading to an impairment charge *for years*.

## DEFENDANTS ACTED WITH SCIENTER

122.    Defendants either knew or recklessly disregarded the false and

misleading nature of the foregoing information they disseminated to the investing

public.  Defendants' scienter is demonstrated by several categories of fact alleged

herein.

123.    *First*, the Defendants' own statements during the Class Period establish

their knowledge of the true facts concerning the deterioration of ANN's business

and financial performance – *i.e.*, of the objective facts underlying the Company's

impairment charge.  For example, as alleged above, throughout the Class Period the

Individual Defendants repeatedly acknowledged the significant declines in the

Company's sales and store traffic, and made repeated reference to the Company's significant and mounting difficulties.  Knowledge of these facts required Defendants to reassess and impair the value of the Company's goodwill and other intangible assets.   Despite this knowledge, Defendants failed to impair these assets and continued to disclose them at inflated values, thereby falsely reassuring the market that the value of the Company's ANN business remained strong notwithstanding its deteriorating sales and other metrics.

124.   Similarly, the metrics published by Defendants in the Company's SEC filings throughout the Class Period reflected their knowledge of this deterioration – *i.e.*, the Company's public disclosures concerning the declining performance of ANN reveal Defendants' awareness and knowledge of the objective facts requiring impairment.

125.   Ultimately, defendant Giammatteo admitted that Defendants knew the objective facts indicating impairment during the Class Period.  As he stated during the Company's June 8, 2017 conference call: "***This [impairment] charge represents a significant change in the market environment we've seen <u>over the past couple of years</u>***."

126.   *Second*, the Company had robust systems in place to channel detailed information concerning the Company's deteriorating operations to the Individual Defendants and other senior managers.  For example, in the 2016 10-K, the

Company disclosed that it had "completed [its] migration to common information technology platforms for its Company-wide point-of-sales systems, merchandise systems, warehouse management systems and financial systems."  In other words, the Company had placed its entire business on a common electronic platform that allowed senior management to monitor and analyze the Company's operations.

127.   Further, Ascena's top management met once a week to discuss any issues at the Company.  As defendant Jaffe started in an October 28, 2015 interview with *Women's Wear Daily*, "I use the word 'collaborative' a lot, so I speak to all of our presidents every week . . . .  I bring them all together once a week for a senior leadership meeting to stay connected and talk about the issues."  The article went on to note that "Jaffe also talks to his division heads on an individual basis. 'We talk about what they are going through.  It could be marketing issues, it could personnel issues.  It could be sourcing challenges, but they have the final say.'"[7]  Accordingly, Ascena's highest executives would have been aware that the Company was facing a sustained downturn and that an impairment charge was inevitable.

128.   In addition, during the Class Period, the Company retained the consulting company Accenture to conduct a detailed analysis of the Company's

---

[7]     *Women's Wear Daily*, *Ascena CEO Reveals Acquisition Strategy*, HERBERT MINES ASSOCIATES (Oct. 28, 2015), https://www.herbertmines.com/media/ascena-ceo-reveals-acquisition-strategy.

operations and to make recommendations for improvement.   This analysis by Accenture necessarily served as another source of information to Defendants concerning the Company's continuing operational problems.   On May 31, 2016, Defendant Jaffe announced that the Company had retained Accenture "to proactively engage with us in an enterprise-wide transformation project."

129.   As a result of Accenture's work, on October 4, 2016, the Company announced its "Change for Growth" program, which would "refine [the Company's] operating model to increase its focus on key customer segments, improve its time-to-market, reduce working capital, and enhance its ability to serve its customer on any purchasing platform, all while better leveraging the Company's powerful shared services platform."   At the same time, the Company announced a reorganization of its businesses, including the creation of a separate "Premium Fashion" segment consisting solely to the ANN brands.   As Defendant Jaffe explained on October 4, 2016: "We will continue to work aggressively on customer-facing capability and operating efficiencies to drive benefits on both the margin and cost side of our financials, and we believe there is additional opportunity beyond what we have highlighted today as we continue our transformation work with Accenture."   Accenture's work for Defendants further strengthens the inference of scienter.

130.   *Third*, the Individual Defendants are highly sophisticated financial professionals who certainly understood the meaning of the objective facts of

Ascena's deteriorating business, as well as the implications of these facts for the overstated financial performance of the Company's ANN subsidiary.  Defendant Jaffe received his undergraduate degree from the Wharton School of Business and his M.B.A. from Stanford.  Defendant Jaffe then spent a decade working in the private equity field before joining Ascena.  Defendant Jaffe was also highly experienced in mergers and acquisitions ("M&A") transactions, with the ANN acquisition representing his *fourth* major M&A transaction in a decade.  For his part, defendant Giammatteo was the Company's CFO and received his M.B.A. from the Massachusetts Institute of Technology.  The Individual Defendants' experience and sophistication in financial matters indicates that they must have understood the meaning of the objective facts within their possession concerning the Company's deterioration throughout the Class Period.

131.  *Fourth*, the fraud alleged herein relates to the core business of Ascena, and knowledge of that fraud is imputed to Defendants.  According the Company's 2016 10-K, the ANN brands accounted for approximately 33% of the Company's total net sales – more than double the next closest brand, Lane Bryant, with just 16% of Ascena's total net sales.  Accordingly, it is appropriate to presume that Defendants were apprised of, had access to, and had actual knowledge of all material information related to ANN during the Class Period, including the material information that was improperly withheld and/or misrepresented to investors.

132.   *Fifth*, the sheer magnitude of the impairment charge raises a strong inference of scienter.   In the 2016 10-K, the Company disclosed total assets of approximately $5.5 billion.   The impairment charge at issue in this case reduced that sum by over $1.3 billion.   In other words, the impairment charge reduced the Company's total assets by almost 25% – ***eliminating nearly a quarter of the Company's total assets from its balance sheet***.   This enormous gap between the true value of the Company's assets and the value disclosed by Defendants during the Class Period raises a strong inference that Defendants did not believe – and could not have believed – the value they ascribed to the Company's goodwill and other intangible assets.

133.   *Finally*, Defendant Jaffe had unique personal motivations to mislead the investing public concerning the Company's financial performance.   Defendant Jaffe's parents founded the Company and built it into a nation-wide retail success story.   To acknowledge that the value of ANN and its brands were worth far less than disclosed would have required Defendant Jaffe to admit his failure and accept responsibility for the calamity facing his parents' company.   As a result, Defendant Jaffe had a specific personal motivation to disregard the impairment of Company's ANN assets.   This motivation contributes further to a strong inference of scienter.

## LOSS CAUSATION/ECONOMIC LOSS

134.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Ascena common stock and operated as a fraud or deceit on Class Period purchasers of Ascena common stock by failing to disclose and misrepresenting the adverse facts detailed herein.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Ascena common stock fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of Ascena common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

135.   By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Ascena's business and prospects. Defendants' false and misleading statements and omissions had the intended effect and caused Ascena common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $12.72 per share on December 31, 2015.

136.   The precipitous decline in the price of Ascena common stock was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the decline in the price of Ascena common stock negates any inference that the loss suffered by Plaintiffs and

the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Ascena common stock and the subsequent significant decline in the value of Ascena common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## CLASS ACTION ALLEGATIONS

137.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Ascena common stock between December 1, 2015 and May 17, 2017, inclusive, who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate families of each Defendant, the Company and its officers and directors at all relevant times, any entity in which any excluded party has or had a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, heirs, successors or assigns of any such excluded party.

138.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Ascena common stock was actively traded on the NASDAQ Global Select Market.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through

appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Ascena or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

139.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class have been similarly affected by Defendants' conduct in violation of federal law that is complained of herein.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

140.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

141.   Common questions of law and fact apply equally to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether Defendants misrepresented and/or omitted material facts about Ascena and its business;

(c)     whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(d)     whether the price of Ascena common stock was artificially inflated during the Class Period; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

142.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

143.   During the Class Period, the market for Ascena common stock was an efficient market for the following reasons, among others:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Ascena common stock traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company's stock traded on the NASDAQ Global Select Market and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiffs and members of the Class purchased or acquired Ascena common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

144.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

145.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## NO SAFE HARBOR

146.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged. Many of the statements herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking

statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Ascena who knew that those statements were false when made.

### COUNT I

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

147.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

148.   During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

149.   Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5 [17 C.F.R. §240.10b-5], in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or

omitted to state material facts necessary to make the statements not misleading; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

150.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Ascena common stock.  Plaintiffs and the Class would not have purchased Ascena common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

151.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Ascena common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

152.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

153.   The Individual Defendants acted as controlling persons of Ascena within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of Ascena, and their ownership

of Ascena common stock, the Individual Defendants had the power and authority to cause Ascena to engage in the wrongful conduct complained of herein.

154.   As set forth above, Ascena and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.   Moreover, by virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for Ascena's Section 10(b) and Rule 10b-5 violations.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class representatives, and designating Lead Counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  November 21, 2019          SEEGER WEISS LLP
                                   CHRISTOPHER A. SEEGER
                                   DAVID R. BUCHANAN
                                   CHRISTOPHER L. AYERS


                                   _____
                                       */s/ Christopher A. Seeger*
                                   CHRISTOPHER A. SEEGER

55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973/639-9100
973/584-9393 (fax)
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
cayers@seegerweiss.com

*Local Counsel*

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
LINDSAY LA MARCA
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367/1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
llamarca@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
NOAM MANDEL
125 Park Avenue, 25th Floor
New York, NY  10017
Telephone:  212/791-0567
Telephone:  212/693-1058
212/693-7423 (fax)
noam@rgrdlaw.com

POMERANTZ LLP
JEREMY A. LIEBERMAN
MURIELLE J. STEVEN WALSH
AATIF IQBAL
600 Third Avenue
New York, NY  10016
Telephone:  212/661-1100
917/463-1044 (fax)
jalieberman@pomlaw.com
mjsteven@pomlaw.com
aiqbal@pomlaw.com

POMERANTZ LLP
PATRICK V. DAHLSTROM
10 South LaSalle Street, Suite 3505
Chicago, IL  60603
Telephone:  312/377-1181
312/229-8811 (fax)
pdahlstrom@pomlaw.com

*Lead Counsel for Lead Plaintiffs*

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone: 770/200-3104
770/200-3101(fax)
michaelf@johnsonfistel.com

*Additional Counsel for Lead Plaintiff Joel
Patterson*

BRONSTEIN, GEWIRTZ &
  GROSSMAN, LLC
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  212/697-6484
212/697-7296 (fax)
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff
Michaella Corporation*

<u>CERTIFICATE OF SERVICE</u>

I, CHRISTOPHER A. SEEGER hereby certify that on November 21, 2019, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Christopher A. Seeger*
_____
CHRISTOPHER A. SEEGER