**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re ASCENA RETAIL GROUP, INC.<br>SECURITIES LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br>ALL ACTIONS.<br>_____ | ) No. 2:19-cv-13529-KM-JBC<br>)<br>) <u>CLASS ACTION</u><br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANTS' MOTION TO DISMISS</u>**

Date: May 22, 2020

{00375817;11 }

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 4

I.  Background of Ascena ........................................................................................... 4

II.  Ascena Acquires Ann Inc. ..................................................................................... 4

III.  GAAP Provisions Regarding Goodwill, Other Intangible Assets and Impairment ............ 5

IV.  Defendants Knew or Recklessly Disregarded that the Goodwill and Intangible Assets of Ascena and its Core ANN Segment Were More than Likely Impaired ............................ 6

A.  *Impairment Indicator #1*: Decline and Deterioration in Financial Performance .... 7

B.  *Impairment Indicator #2*: Industry and market considerations, such as a deterioration in the operating environment and increased competition .................. 9

C.  *Impairment Indicator #3*: Other relevant entity-specific events, such as changes in strategy and customer habits .................................................................. 10

D.  *Impairment Indicator #4*: Sustained decrease in Ascena's share price ................ 10

V.  Class Period False and Misleading Statements and Omissions ..................................... 11

VI.  The Truth Emerges Through a Series of Disclosures Culminating on June 8, 2017 ........ 12

A.  Defendants' May 17, 2017 Press Release .......................................................... 12

B.  Defendants' June 8, 2017 Disclosures .............................................................. 13

ARGUMENT ............................................................................................................... 14

I.  Legal Standards Applicable to the Motion to Dismiss ........................................... 14

II.  The Complaint Sufficiently Alleges that Defendants Violated §10(b) ........................... 14

A.  The Complaint Adequately Pleads that Defendants Made False and Misleading Statements and Omissions Concerning Ascena's and ANN's Goodwill and Other Intangible Assets .............................................................................. 15

B.  The Complaint Alleges A Strong Inference of Scienter ....................................... 21

1.  The Complaint Alleges Defendants Knew That an Impairment Was "More Likely Than Not" Via Their Knowledge of Triggering Events ............... 21

2.  The Impairment's Magnitude and Timing Are Evidence of Scienter ....... 24

3.  ANN is a Core Operation of Ascena ......................................................... 25

4.  Ascena and Jaffe Had Motive to Delay the Impairment ........................... 26

C.  The Complaint Sufficiently Alleges Loss Causation .......................................... 26

III.    Plaintiffs' Claims are Timely ............................................................................ 28

IV.    The Complaint Adequately Alleges Section 20(a) Control Person Liability Claims ....... 30

V.    Leave to Amend Should Be Allowed ............................................................... 30

CONCLUSION ....................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
824 F. Supp. 2d 1164 (C.D. Cal. 2011) ...............................................................27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................14

*In re Atlas Air Worldwide Hldgs., Inc. Sec. Litig.*,
324 F.Supp.2d 474 (S.D.N.Y. 2004).............................................................16, 21

*Bauer v. Prudential Fin., Inc.*,
2010 U.S. Dist. LEXIS 64384 (D. N.J. June 29, 2010) ......................................18

*Beezley v. Fenix Parts, Inc.*,
2018 U.S. Dist. LEXIS 118250 (N.D. Ill. July 13, 2018).....................................15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................................................14

*In re Bradley Pharm., Inc. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006) .................................................................27, 28

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)................................................................................13

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) .......................................................................25

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
321 F. Supp. 2d 1342 (N.D. Ga. 2004).............................................................23, 24

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align
Technology, Inc.*,
856 F.3d 605 (9th Cir. 2017) ................................................................................20

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ................................................................................16

*City of Omaha, Nebraska Civilian Employees' Retirement System. v. CBS Corp.*,
679 F.3d 64 (2d Cir. 2012)..............................................................................20, 28

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. PLC*,
    655 F. Supp. 2d 262 (S.D.N.Y. 2009)......................................................................20

*Davidco Inv'rs LLC v. Anchor Glass Container Corp.*,
    2006 U.S. Dist. LEXIS 11527 (M.D. Fla. Mar. 6, 2006) ...................................16, 23

*De Vito v. Liquid Holdings Grp., Inc.*,
    2018 U.S. Dist. LEXIS 217963 (D.N.J. Dec. 31, 2018)................................... *passim*

*In re Delcath*,
    36 F. Supp. 3d 320 (S.D.N.Y. 2014).......................................................................28

*Dudley v. Haub*,
    2013 U.S. Dist. LEXIS 61386 (D.N.J. Apr. 30, 2013) ..................................... *passim*

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)...............................................................................................26

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005).................................................................17, 23

*In re Galema Biopharma, Inc. Sec. Litig.*,
    336 F. Supp. 3d 378 (D.N.J. 2018) .........................................................................30

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)...................................................................................27

*In re Global Crossing, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004).....................................................................21

*Gruber v. Price Waterhouse*,
    911 F.2d 960 (3d Cir. 1990)...................................................................................29

*Hull v. Glob. Dig. Sols., Inc.*,
    2017 U.S. Dist. LEXIS 208191 (D.N.J. Dec. 19, 2017).........................................29

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)........................................................................14, 15, 26

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*,
    2010 U.S. Dist. LEXIS 30693 (E.D. Wis. Mar. 30, 2010) .....................................24

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005).....................................................................20

*In re: KLX Securities Litigation*,
    232 F.Supp.3d 1269 (S.D. Fla. 2017) .....................................................................20

- iv -

*In re Leapfrog Enter., Inc. Sec. Litig.*,
 237 F. Supp. 3d 943 (N.D. Cal. 2017) ...................................................19, 23, 24, 25

*Loral Space & Commc'ns Ltd. Sec. Litig.*,
 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004)............................................................20

*In re Merck & Co.*,
 2015 U.S. Dist. LEXIS 62983 (D.N.J. May 13, 2015).............................................18

*Merck & Co. v. Reynolds*,
 559 U.S. 633 (2010)..................................................................................................29

*In re Merck Co.*,
 2006 U.S. Dist. LEXIS 2345 (D.N.J. Jan. 20, 2006) ............................................7, 19

*Nat'I Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
 720 F. Supp. 2d 517 (D.N.J. 2010) ..........................................................................20

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)................................................................................21, 22

*Omanoff v. Patrizio & Zhao LLC*,
 2015 U.S. Dist. LEXIS 43086 (D.N.J. Mar. 31, 2015)................................26, 27, 29

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 575 U.S. 175 (2015)..................................................................................2, 18, 19, 20

*In re Omnicom Grp., Inc. Sec. Litig.*,
 2005 U.S. Dist. LEXIS 5272 (S.D.N.Y. Mar. 28, 2005) .....................................15, 23

*Oran v. Stafford*,
 226 F.3d 275 (3d Cir. 2000)........................................................................................7

*Padgettt v. RIT Techs. Ltd.*,
 2019 U.S. Dist. LEXIS 28996 (D.N.J. Feb. 22, 2019) ............................................30

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization
 Transactions, Inc.*,
 730 F.3d 263 (3d Cir. 2013)......................................................................................29

*Phillips v. Cty. of Allegheny*,
 515 F.3d 224 (3d Cir. 2008)......................................................................................14

*PR Diamonds, Inc. v. Chandler*,
 91 F. App'x. 418 (6th Cir. 2004) ..............................................................................22

*In re PTC Therapeutics, Inc., Sec. Litig.*,
 2017 U.S. Dist. LEXIS 137930 (D.N.J. Aug. 28, 2017) (McNulty, J.)............................21, 30

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2013)..................................................................................21

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007).................................................................21

*In re Rospatch Securities Litigation*,
   760 F. Supp. 1239 (W.D. Mich. 1991) ...............................................................16

*Sawabeh Info. Servs. Co. v. Brody*,
   832 F. Supp. 2d 280 (S.D.N.Y. 2011).................................................................21

*In re Scottish Re Grp. Sec. Litig.*,
   524 F.Supp.2d 370 (S.D. N.Y. 2007)..................................................................16

*Spitzberg v. Hous. Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) ..............................................................................20

*Stephens v. Clash*,
   796 F.3d 281 (3d Cir. 2015)..........................................................................29, 30

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006)....................................................................15, 22, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................14, 21, 26

*Thor Power Tool Co. v. C.I.R.*,
   439 U.S. 522 (1979)..........................................................................................17, 18

*In re Valeant Pharm. Int'l, Inc. Sec. Litig.*,
   2017 U.S. Dist. LEXIS 66037 (D.N.J. Apr. 28, 2017) .......................................26

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003).................................................................25

*In re Wilmington Tr. Sec. Litig.*,
   29 F. Supp. 3d 432 (D. Del. 2014).......................................................22, 25, 26, 28

*Zwick Partners, LP v. Quorum Health Corp.*,
   2018 U.S. Dist. LEXIS 97942 (M.D. Tenn. Apr. 19, 2018).......................... *passim*

**Statutes**

28 U.S.C. § 1658(b)(1) ............................................................................................28

Private Securities Litigation Reform Act of 1995 ................................................15, 26

Securities Exchange Act of 1934...............................................................................1

**Rules**

Fed. R. Civ. P. 9(b) ..............................................................................................................15, 26

Fed. R. Civ. P. 12(b)(6)...........................................................................................................14

Lead Plaintiffs Joel Patterson and Michaella Corporation ("Lead Plaintiffs" or "Plaintiffs") hereby oppose the Motion to Dismiss (Dkt. No. 47) the Consolidated Amended Complaint (Dkt. No. 42) (the "Complaint") filed by Defendants Ascena Retail Group, Inc. ("Ascena" or the "Company"), David R. Jaffe, and Robert Giammatteo[1] as follows:

## INTRODUCTION

Plaintiffs bring this securities class action against Ascena and the Individual Defendants (collectively, "Defendants") to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder, on behalf of a class of investors who purchased or otherwise acquired Ascena common stock between December 1, 2015 and May 17, 2017, inclusive (the "Class Period"). ¶ 1.[2]

This case arises from Defendants' fraudulent overstatement of the value of Ascena, and its subsidiary, ANN, Inc. ("ANN"). In particular, throughout the Class Period, Defendants repeatedly and consistently overstated the value of ANN's brands and associated goodwill, ascribing wildly inflated values to these assets and materially misrepresenting the Company's financial position, performance, and prospects. Defendants maintained their false portrayal of ANN and its exaggerated valuation even as negative information about ANN's performance accumulated, fraudulently reassuring investors that ANN remained strong despite the worsening condition of its business. Ultimately, Defendants were forced to announce an impairment charge of over $1.3 billion, of which nearly $1 billion was directly related to ANN.

Defendants demand dismissal based on four groundless arguments. The Court should reject all of them and deny Defendants' motion.

---

[1] Jaffe and Giammatteo are referred to herein as the "Individual Defendants."

[2] Citations to "¶" or "¶¶" herein refer to the paragraphs of the Complaint. References to "Defs' Mem." are to the Defendants' Memorandum in Support of their Motion (Dkt. No. 47-1). All internal citations and quotations are omitted and all emphasis is added unless otherwise noted.

*First*, Defendants claim that the Complaint alleges no false or misleading statements. That is wrong. The Complaint alleges that Defendants inflated ANN's value in their financial disclosures by approximately $1 billion—the very sum by which Defendants were ultimately required to impair that asset. As courts have recognized, "[g]oodwill does not go from being unimpaired to fully impaired overnight." *Dudley v. Haub*, 2013 U.S. Dist. LEXIS 61386, at *30-31 (D.N.J. Apr. 30, 2013). Defendants' boilerplate "fraud by hindsight" arguments are likewise unavailing because the Complaint alleges contemporaneous events and circumstances in each relevant quarter showing that ANN's goodwill and intangible assets were already impaired despite Defendants' false statements. Defendants also attempt to evade liability by arguing that their financial disclosures of specific dollar valuations for ANN and its assets were just opinions. The argument misconstrues both the Complaint and the U.S. Supreme Court's *Omnicare* decision. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). Not only do the challenged statements contain materially false "embedded statements of fact" and material omissions, but the gravamen of the Complaint is that Defendants did not believe—and could not have actually believed—the opinion that ANN was worth $1 billion more than they eventually admitted. *Id*. at 183-92.

*Second*, Defendants argue wrongly that the Complaint fails to raise the required strong inference of scienter. Not so. Although such scienter arguments are often *de rigueur* in securities litigation, they have no application in cases where, as here, Defendants have admitted that their sudden $1 billion impairment charge was actually brought on by "a significant change in the market environment *we've seen over the past couple of years.*" ¶ 125. Moreover, the Court should reject Defendants' invitation to review the Complaint's scienter allegations in piecemeal fashion. Among other things—and consistent with their own admissions—the Complaint alleges

that Defendants were aware of multiple specific and growing impairment indicators and other "red flags" throughout the Class Period; that Defendants had robust systems and practices in place that gave them access to specific information contrary to their disclosures; that the Individual Defendants were highly sophisticated and experienced financial professionals who necessarily understood the significance of the contrary information in their possession; that ANN was a fundamental core operation of their business, constituting approximately one-third of the Company's total annual sales; that the magnitude of the impairment—which eliminated nearly a quarter of the total assets on the Company's balance sheet in a single stroke—is inconsistent with Defendants' current pleas of ignorance; and that Defendant Jaffe had additional personal motivations to conceal his responsibility for the disaster his own conduct inflicted on the Company his parents founded. Viewed together, as they must be, these allegations more than establish the required strong inference of scienter.

*Third*, the Court should reject Defendants' baseless loss causation argument. The Complaint alleges that, on May 17, 2017, Defendants announced the need for interim impairment testing and their expectation that a material impairment was likely, leading to an immediate 26% stock price decline. ¶ 118. These allegations are sufficient to plead loss causation. Defendants' speculation that other information was to blame for this price decline is a fact intensive contention inappropriate on motion to dismiss and inconsistent with the well-established rule that plaintiffs need not "plead facts indicating that disclosure of the alleged fraud was the sole reason for the investment's decline in value." *De Vito v. Liquid Holdings Grp., Inc.*, 2018 U.S. Dist. LEXIS 217963, at *107 (D.N.J. Dec. 31, 2018) (McNulty, J.). Defendants also attempt an invalid "truth on the market" defense, ignoring that, as alleged in the Complaint, Defendants used their

unique access to Company information to repeatedly and consistently reassure investors of the continuing strength and value of ANN despite its deteriorating performance.

*Finally*, Defendants attempt a nonsensical limitations period argument, asserting that the limitations period commenced running before the Company even announced its $1.3 billion impairment charge (of which approximately $1 billion pertained to ANN). As set forth in the Complaint, Defendants quantified their massive impairment and allocated it among the Company's business segments on June 8, 2017. No reasonably diligent plaintiff could fairly have been expected to commence this action prior to that date, and Defendants acknowledge, as they must, that this action was filed less than two years afterward.

## STATEMENT OF FACTS

### I.    Background of Ascena

Ascena is a retailer of apparel for women and tween girls. ¶ 25. Through its subsidiaries, Ascena owns brands such as Ann Taylor, LOFT, and Lane Bryant, and operates through retail and online stores. ¶¶ 4, 25. Jaffe's parents founded Ascena's predecessor company, The Dress Barn, Inc., in 1962, with a focus of providing affordable womenswear for the workplace. ¶ 26. Jaffe took control after a career in private equity and began expanding Ascena through acquisitions including "brands whose target customers are … outside Dress Barn's target demographic" of middle-aged women seeking low-to-mid-priced workplace attire. ¶¶ 27, 29. From 2005 through 2012, Ascena spent $1.49 billion in a series of acquisitions of brands whose target customers were tween girls and plus-sized women. *See* ¶¶ 30-32. By 2015, Ascena's expansion-driven strategy was in place and it would soon embark on its largest acquisition yet.

### II.    Ascena Acquires Ann Inc.

Ascena's acquisition spree culminated in 2015 when it sought to break into the premium fashion business, moving even further away from its discount fashion roots and more recent

forays into niche brands directed at plus-sized women and tween girls. *E.g.*, ¶¶ 30-35, 39. On May 18, 2015, Ascena announced that it had entered into a merger agreement with ANN, which, under the Ann Taylor and LOFT brands, sells premium fashion-forward clothing and accessories aimed at affluent female buyers between the ages of 25 to 50 years. ¶¶ 33, 35.[3]

On December 1, 2015—the first day of the Class Period—Ascena disclosed that it preliminarily valued the goodwill and other intangible assets (consisting of trade names) attributable to the ANN acquisition at $953.2 million and $815 million, respectively. ¶ 58. Throughout the Class Period, most—as much as approximately 75%—of the goodwill disclosed by Ascena was attributable to the ANN brands.[4] On September 19, 2016, Ascena issued its Form 10-K annual report for FY2016 (ending July 30, 2016), disclosing $959.6 million in goodwill from the ANN acquisition, with $733.9 million assigned to ANN and the remaining $225.7 million allocated to other reporting units based on savings and synergies in those units resulting from the acquisition. ¶¶ 40, 81. These goodwill amounts were significantly artificially inflated throughout the Class Period due to Defendants' knowing or reckless failure to take the appropriate impairment charge. It is the billions of dollars of goodwill and other intangible assets that Defendants assigned to ANN beginning on December 1, 2015 that is at issue in this case.

## III.   GAAP Provisions Regarding Goodwill, Other Intangible Assets and Impairment

At all relevant times, Ascena was required to follow the guidance of Generally Accepted Accounting Principles ("GAAP"), Accounting Standards Codification ("ASC") Topic No. 350, in accounting for its goodwill and indefinite life intangible assets. ¶ 51; *see also, e.g.*, ¶¶ 59-60.

---

[3] $1.8 billion of the $2.1 billion deal was financed through a term loan. *See* ¶38; Defs' Ex. 1 at 9.

[4] The vast majority of the value of trade names disclosed by the Company was also similarly attributable to the ANN segment. *See, e.g.*, ¶¶ 58, 80-81, 100.

Goodwill is an intangible asset arising from a company's acquisition of another company that represents the excess of the purchase price over the fair value of the acquired assets. *E.g.*, ¶¶ 41, 60. Companies must test goodwill for impairment annually and, as at issue here, on an interim basis (*e.g.*, for any quarter) when an assessment of "qualitative factors" may indicate that the amount of goodwill reflected in the company's financial statements for a reporting unit (*i.e.*, the carrying amount) exceeds its fair value. ¶¶ 42-43. The factors—triggering events and circumstances—that may indicate goodwill is impaired include: (a) macro-economic conditions, (b) industry and market considerations, (c) cost factors, (d) overall financial performance, (e) other relevant entity-specific events, (f) events affecting a reporting unit, and (g) a sustained decrease in share price. ¶ 42. If any triggering events, individually or collectively, make it more likely than not that the fair value of a reporting unit is less than its carrying amount, then the entity must perform a quantitative test comparing the reporting unit's fair value with its carrying amount. *See, e.g.*, ¶¶ 41-50. The amount of a goodwill impairment charge is the amount that the reporting unit's carrying amount exceeds its fair value. ¶¶ 41-43, 60.[5]

As shown below, many of the triggering events existed as of December 1, 2015 and worsened throughout the Class Period. Those circumstances indicated to Defendants that Ascena's goodwill and intangible assets were being carried at artificially inflated values and that an impairment charge was necessary to accurately reflect the value of those assets. *E.g.*, ¶ 61.

**IV.     Defendants Knew or Recklessly Disregarded that the Goodwill and Intangible Assets of Ascena and its Core ANN Segment Were More than Likely Impaired**

Prior to and throughout the Class Period, numerous triggering events occurred, alerting Defendants that the goodwill and trade names of Ascena and ANN were significantly impaired.

---

[5] The accounting treatment for intangible assets with infinite useful lives—the ANN trade names at issue here—is similar to the accounting treatment for goodwill. *See, e.g.*, ¶¶ 41, 44-50, 59.

Such developments were impairment indicators that should have prompted Defendants to write-down the value of those assets. As discussed below, Ascena suffered severe deterioration in financial performance and in other key metrics relied on to support the value of those assets, which was known to Defendants. *E.g.*, ¶¶ 51-55, 62, 68, 73-76, 89-93, 104-05, 112-20.

> ## A.    *Impairment Indicator #1*: Decline and Deterioration in Financial Performance

Defendants knew that declining store traffic caused in part by a shift towards online shopping was contributing to a decline in comparable store sales—a key performance metric the market closely followed.[6] ¶ 53. Further, Ascena increased promotions and discounts to offset store traffic declines, compounding the Company's financial woes by reducing margins and profitability. *See, e.g.*, ¶¶ 52, 105-06.

Defendants were well aware of those and other problems prior to and throughout the Class Period. Their own disclosures revealed a steady drumbeat of deteriorating performance, comparable store sales declines, negative trends, and downwardly revised guidance, which should have triggered an impairment analysis and write-down before May 2017. *See, e.g.*, ¶¶ 62, 68, 73, 75, 89-90, 91-93, 104, 106, 112-13.[7] Significantly, the comparable store sales of Ascena's ANN brands was trending down by the start of the Class Period, and the decline worsened throughout the Class Period, especially in the Ann Taylor division:

---

[6] Comparable store sales, or "comps," refer to "the change in sales of stores open in a given period as compared to same calendar period in the prior year[.]" ¶ 53 n.6.

[7] Defendants rely heavily on "Ascena's judicially noticeable public disclosures[,]" which they claim "show [that] the company's challenges worsened during the class period and took an especially bad turn shortly before Ascena decided to perform interim testing." Defs' Mem. at 6 & n.2; *see also id.* at 7-10. Such disclosures may only be considered "'for the limited purpose of showing that a particular statement was made by a particular person,' and not 'for the truth of the matters purportedly contained [therein.]'" *In re Merck Co.*, 2006 U.S. Dist. LEXIS 2345, at *9-10 (D.N.J. Jan. 20, 2006) (quoting *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000)).

Regardless, the narrative Defendants attempt to spin from such materials actually supports Plaintiffs' claims. *See, e.g.*, Defs' Mem at 7-8 (discussing 1Q16 to 3Q16 results showing Defendants reduced FY16 earnings guidance by 11%-13% and pointed to declining store traffic, macro retail headwinds, and negative sector-wide traffic trends contributing to sales challenges).

|  | 2Q15 | 3Q15 | 4Q15 | 1Q16 | 2Q16 | 3Q16 | 4Q16 | 1Q17 | 2Q17 |
|---|---|---|---|---|---|---|---|---|---|
| Ascena | 1% | -1% | -2% | -3% | -5% | -4% | -5% | -5% | -4% |
| Ann Taylor | 0% | -3% | -2% | -4% | -7% | -5% | -12% | -11% | -9% |
| LOFT | 2% | -1% | -2% | -1% | 1% | 2% | -2% | -3% | -2% |

¶¶53. In fact, Defendants' disclosures show that Ascena's and ANN's comparable store sales were negative in each of the three quarters that closed prior to the Class Period. *Id.* Ann Taylor did not have a single quarter of positive comparable store sales during the Class Period. *Id.*

Early in the Class Period, Jaffe addressed ANN's declining revenues and comparable store sales when discussing the Company's 1Q16 and 2Q16 results. *See* ¶¶ 62, 68. During the 3Q16 earnings call, Jaffe and Giammatteo discussed "elevated traffic headwinds" as challenges Ascena was not able to fully mitigate, justified adjusting Ascena's earnings outlook downward in part due to the traffic challenges impacting comparable sales that "we've seen continue through May," and expect to continue and result in negative comparable sales for 4Q16. ¶¶ 73, 75.

Ascena's performance continued to deteriorate throughout the rest of the Class Period:

- **FY16 Earnings Call**: Jaffe explained that 4Q16 performance fell "*well below expectations*[,]" that earnings guidance was reduced, and that comparable sales and store traffic were down double digits in May and high single digits in June/July. ¶ 90. On the same call, Jaffe commented on Ann Taylor's dismal performance and the company's negative outlook by stating "Ann Taylor comp sales were down 12%...caused primarily by store traffic which was down high-single digits" and "*overall…we expect to have negative store growth in FY17.*" ¶¶ 91-92.
- **1Q17 Earnings Call**: Jaffe stated that the Company's performance in that quarter "was *again challenged by ongoing store traffic headwinds and increasing customer price sensitivity that our industry has been contending with for multiple seasons*[,]" expressed disappointment with Ascena's sales performance, and disclosed that Ascena's "comp sales were down 5% below our run rate in mid-September when we issued our FY17 and first quarter guidance").[8] ¶ 104. During the same call, Jaffe disclosed that "[c]omp sales in our premium fashion segment were down 6%" with LOFT and Ann Taylor comparable store sales down 3% and 11%, respectively, on 8% and 13% store traffic declines, respectively. ¶ 104.

---

[8] Giammatteo likewise noted that "Comp sales were down 5%, but outperformed an 8% decline in store traffic and a 2% decline in average dollar sale that resulted from increased promotional activity that was needed to offset softer than expected demand." ¶ 105.

- **January 10, 2017 Press Release**: Jaffe disclosed that "[w]e were disappointed by our overall Holiday performance" and "we experienced stronger than expected store traffic headwinds" that forced the Company into "more highly promotional stance…in the face of softer overall consumer demand." ¶ 106.
- **2Q17 Earnings Call**: Jaffe acknowledged a "continuation of trends that have been in place for some time[,]" and "business remain[ing] soft due to ongoing store traffic headwinds and overall customer price sensitivity, which have become persistent issues impacting our larger sector." ¶ 113.[9]

### B.    *Impairment Indicator #2*: Industry and market considerations, such as a deterioration in the operating environment and increased competition

Defendants were also aware of the deterioration in the market in which ANN operated and the increased competitive environment. *E.g.*, ¶ 51. Throughout the Class Period, Ascena and its ANN brands faced persistent, industry-wide traffic headwinds and competitive pressures from "a highly elevated promotional environment." ¶ 116; *see also* ¶ 106. As Jaffe noted in the 2Q16 earnings call: "[w]e were not immune to the ***macro specialty retail environment***, which was adversely impacted by soft traffic and the late onset of seasonal weather." ¶ 68. Jaffe explained that the 2016 fiscal year was "characterized by a highly competitive selling environment and significant store traffic headwinds[,]" as well as inconsistent off-peak demand. ¶ 89. Giammatteo also explained when discussing 1Q17 results that the quarter's "2% decline in average dollar sale [] resulted from increased promotional activity that was needed to offset softer than expected demand." ¶ 105. These issues not only persisted throughout the remaining part of the Class Period, but also were identified by Defendants as a factor prompting the write-downs that the Company belatedly took. *See, e.g.*, ¶ 90 (Jaffe noting with respect to 1Q17 that "[o]ur customer remains inconsistent" and "our brands are evaluating opening price point strategies to mitigate traffic headwinds"); ¶ 114 (identifying "the impact of the challenging retail environment" as

---

[9] *See also, e.g.*, ¶ 113 (2Q17 earnings call in which Jaffe addressed the headwinds negatively impacting Asecna's performance and outlook and ANN's comp sales and traffic declines).

triggering Ascena's 3Q17 impairment test).

### C.    *Impairment Indicator #3*: Other relevant entity-specific events, such as changes in strategy and customer habits

Changes in strategy and in customer habits provided Defendants with yet another impairment indicator that should have triggered an impairment test and write-down. Specifically, the ANN acquisition and Ascena's move into premium fashion marked a change in strategy focusing on a new type of target customer and a market where Defendants lacked experience. *See, e.g.*, ¶¶ 33-34. Defendants also acknowledged changes in customer habits, and an inability to understand them. *See, e.g.*, ¶ 93 (Jaffe stating on Sept. 16, 2016 that "[i]t's tough out there" and "[w]e've all seen the reports [of female apparel shoppers pulling back], and can't really put our finger on what it is that's brought her back from where she was in terms of spending").

### D.    *Impairment Indicator #4*: Sustained decrease in Ascena's share price

The significant weakening of Ascena's business was reflected in Ascena's stock price— another important indicator of potential impairment—that declined significantly and persistently during the Class Period. Here, Ascena suffered sustained stock price declines throughout the Class Period, as demonstrated in the stock price chart included in the Complaint. ¶ 54. For example, Ascena's stock price suffered a sustained decrease from April 2016 to the end of the Class Period a little more than a year later. *Id.*; *see also* Defs' Ex. 18. During that time, Ascena's stock price was especially hard hit for extended periods, particularly from around April to June 2016, from August through October 2016, and from late 2016 until May 17, 2017. *See id.*

Notably, Defendants cited as a triggering event for impairment testing the stock price decline for the period between Ascena's release of 2Q17 results on March 6, 2017 and its May 17, 2017 disclosure of its interim impairment testing. *E.g.*, ¶ 114. The stock price, however, had already suffered similar, even more drastic declines much earlier in the Class Period, further

supporting that the goodwill impairment should have been taken much earlier.

## V.   Class Period False and Misleading Statements and Omissions

During the Class Period, Defendants misled investors by failing to impair the inflated values of the goodwill and intangible assets of the ANN brands and Ascena. *E.g.*, ¶¶ 56-113.

First, Defendants overstated the total amount of goodwill and intangible assets, particularly for the ANN brands/premium fashion segment,[10] in each of the Company's financial reports on Form 10-Q and Form 10-K issued during the Class Period:[11]

|  | Value (millions) as of | 1Q16 (12/1/15) | 2Q16 (3/1/16) | 3Q16 (5/31/16) | FY16 (9/16/16) | 1Q17 (12/1/16) | 2Q17 (3/6/16) |
|---|---|---|---|---|---|---|---|
| Ascena | Goodwill | $1.273 | $1.268 | $1.268 | $1.279 | $1.279 | $1.279 |
| | Other intangible assets | $1.297 | $1.283 | $1.275 | $1.268 | $1.263 | $1.27 |
| ANN | Goodwill | $953.2 | $948.3 | $948.2 | $733.9[12] | $733.9 | $733.9 |
| | Other intangible assets - Trade names | $815 | $815 | $815 | $815 | $815 | $815 |
| | Citations | ¶ 58[13] | ¶ 65 | ¶ 71 | ¶¶ 80-81 | ¶¶ 99-100 | ¶ 108 |

Further, Defendants' repeated assertions that such amounts were not impaired were false and misleading. *See, e.g.*, ¶¶ 83-85. In connection with those misstatements, Defendants also falsely asserted, including in Ascena's 2016 Form 10-K, that the fair values of ANN's goodwill and intangible assets exceeded their carrying values. *See, e.g.*, ¶¶ 85-86. Likewise, it was false

---

[10] From December 1, 2015 through September 19, 2016, Ascena disclosed the amount of goodwill attributable to each of its brands. *See, e.g.*, ¶¶ 40, 129. On October 4, 2016, Ascena reorganized its business, creating separate segments according to each of their customer groups—*e.g.*, Premium Fashion (comprised of the ANN brands, Ann Taylor and LOFT), Value Fashion (maurices and Dress Barn), Plus Fashion (Lane Bryant & Catherines), and Kids Fashion. *See, e.g.*, ¶ 129. Thereafter, Ascena reported goodwill attributable to each of those segments.

[11] The Individual Defendants signed each of those reports. *See* ¶¶ 58, 65, 71, 79, 98, 107.

[12] As discussed above, Defendants attributed a total $959.6 million in goodwill, of which $733.9 million was assigned to ANN and $225.7 million was reassigned to other reporting units after "an analysis of the expected synergies." ¶ 81. Defendants are incorrect to accuse Plaintiffs of mistaking this reallocation as a write down (Defs' Mem. at 11 n.10), as the Complaint makes clear that the $225.7 million reduction "was assigned to other units[.]" ¶ 81; *see also* ¶ 40.

[13] *See also* Defs' Ex. 1 at 12 (valuing Ascena's other intangible assets as worth $1.297 billion).

and misleading for Defendants to warn that store traffic declines could impact profitability while omitting that Ascena was already facing those declines with no end in sight. ¶ 87.

At the time they made those statements, Defendants knew, or recklessly disregarded, that the ANN brands' declining performance indicated that the Company's goodwill and intangible assets were being carried at artificially inflated values and an impairment charge was necessary to accurately reflect these adverse facts. Defendants also knew or recklessly disregarded that the decline in ANN's sales and performance and other impairment indicators revealed that an impairment analysis was necessary. Further, by inflating the value of those assets, the Company made it appear to be more profitable than it was. *E.g.*, ¶¶ 58, 88.

Second, Defendants falsely claimed that Ascena's financial results were reported in compliance with GAAP (*e.g.*, ¶¶ 94), its accounting policies conformed with GAAP's requirements (*e.g.*, ¶¶ 59-61, 95), and its financial disclosures "are adequate to ensure that the information is fairly presented" (*e.g.*, ¶¶ 63, 102, 110). Those statements are actionable for reasons similar to those explained above, including that, in violation of GAAP, Ascena's Class Period financial statements materially overstated its assets and pre-tax income. *E.g.*, ¶¶ 58, 96.

## VI.   The Truth Emerges Through a Series of Disclosures Culminating on June 8, 2017

### A.   Defendants' May 17, 2017 Press Release

The truth began to emerge on May 17, 2017, when Ascena issued a press release announcing that it would be undergoing an interim impairment analysis of its goodwill and intangible assets that was prompted by "[t]he impact of the challenging retail environment, the decline in the Company's stock price, and the reduction in the Company's forecasted earnings." ¶114. As discussed above, however, Ascena had faced each of those issues throughout the Class Period, and such circumstances indicated that Ascena's goodwill and intangible assets were impaired long before May 17. Thus, the May 17 release, coupled with Defendants' statements

regarding deteriorating performance and related headwinds, confirmed that Defendants had ignored the substantial warning signs that Ascena's goodwill and other intangible assets were impaired and being reported at artificially inflated values since December 1, 2015. ¶ 115.

In response, Ascena's stock price dropped 26% on heavy trading volume. ¶ 118.

**B.      Defendants' June 8, 2017 Disclosures**

The May 17 disclosure, however, was silent as to what segments the impairments would relate to, as well as the precise magnitude of such impairments. Investors would only learn those key details weeks later, on June 8, 2017, when Defendants issued a press release disclosing Ascena's 3Q17 results, quantifying the impairment charge for the first time and only then disclosing the full extent of the artificially inflated goodwill. ¶ 119. Specifically, Defendants disclosed a massive impairment charge of $1.324 billion to the Company's goodwill and other intangible assets, most of which—about 75%—was directly related to write-downs of ANN's goodwill and trade names:

| Segments | Impairment of Goodwill | Impairment of Other Intangible Assets | Total |
|---|---|---|---|
| Premium Fashion (ANN) | $428.9 million[14] | $566.3 million | $995.2 million |
| Value Fashion | $107.2 million | $0 | $107.2 million |
| Plus Fashion | $60.2 million | $161.8 million | $222 million |
| *All segments* | $596.3 million | $728.1 million | $1.324 billion |

*See, e.g.,* ¶ 119; Defs' Ex. 2 at 11-12.[15] The write-down reduced by almost 25% the total assets disclosed in the 2016 10-K. ¶132. The large gap between the true value of Ascena's assets and

---

[14] Defendants misleadingly focus on this portion of the impairment charge, while ignoring the $566.3 million charge to ANN's trade names ($210 million of which was related to Ann Taylor with the remainder related to LOFT) and write-downs to other units whose previously disclosed goodwill values included $225.7 million reallocated from ANN. *See* Defs' Mem. at 4, 10, 14.

[15] While certain of those figures were not specifically alleged in the Complaint, they may be considered at this stage as they were included in documents "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

the value Defendants disclosed throughout the Class Period strongly indicates that Defendants did not believe—and could not have believed—the value ascribed to those assets. *Id.*

In fact, in an earnings call held that same day, Giammatteo made a stunning admission: that the facts underlying the impairment charge existed throughout Class Period, and Ascena's deteriorating sales had been leading to a write-down for years. ¶ 125 ("This charge represents a significant change in the market environment we've seen over the past couple of years.")

## ARGUMENT

### I.    Legal Standards Applicable to the Motion to Dismiss

In deciding "a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must…accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Courts must also "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

To survive, "a complaint must contain sufficient factual material, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). To state a claim, it need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, a complaint should not be dismissed for a failure to state a claim where its factual allegations "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### II.   The Complaint Sufficiently Alleges that Defendants Violated §10(b)

To plead a Section 10(b) claim, a plaintiff must "allege defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiff[] reasonably relied and plaintiff's … reliance was the proximate cause of their injury." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009).

{00375817;11 }                                          14

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b), a plaintiff asserting a Section 10(b) claim must also "specify each allegedly misleading statement, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Id.* at 259. These particularity requirements merely require "plaintiffs [to] support their allegations of securities fraud with … the who, what, when, where and how of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006).

A.    **The Complaint Adequately Pleads that Defendants Made False and Misleading Statements and Omissions Concerning Ascena's and ANN's Goodwill and Other Intangible Assets**

The Complaint alleges contemporaneous events and circumstances in each relevant quarter showing that ANN's goodwill and intangible assets were impaired. Defendants failed to take any impairment despite this overwhelming evidence. *See, e.g.*, *Dudley*, 2013 U.S. Dist. LEXIS 61386, at *32-34 (holding that falsity adequately alleged where four triggering events existed during the two quarters prior to when the impairment was taken); *Zwick Partners, LP v. Quorum Health Corp.*, 2018 U.S. Dist. LEXIS 97942, at *14 (M.D. Tenn. Apr. 19, 2018) ("*Zwick*") (holding that falsity adequately alleged where triggering events, including financial performance declines, increased competition, and negative industry-wide trends, existed in quarters before defendants announced interim impairment testing and goodwill write-downs); *Beezley v. Fenix Parts, Inc.*, 2018 U.S. Dist. LEXIS 118250, at *12 (N.D. Ill. July 13, 2018) (finding defendant's improper accounting and knowing misrepresentation of goodwill demonstrated by its subsequent $43.5 million charge); *In re Omnicom Grp., Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 5272, at *21-22 (S.D.N.Y. Mar. 28, 2005) (securities fraud claim upheld where investments experienced steep declines in revenue and share price, yet company failed to take a write-down). "Whether these triggering events actually occurred, of course, cannot be

determined on this motion to dismiss, because [they must be accepted as true.]" *Zwick*, 2018 U.S. Dist. LEXIS 97942, at *14.

Defendants mischaracterize Plaintiffs' allegations as "fraud by hindsight." It is well settled that a company's failure to timely recognize an impairment is not fraud by hindsight where, as here, the plaintiffs allege impairment indicators that existed during the period they allege the impairment should have been recognized. *E.g. Dudley*, 2013 U.S. Dist. LEXIS 61386, at *34; *Zwick*, 2018 U.S. Dist. LEXIS 97942, at *14-18; *In re Atlas Air Worldwide Hldgs., Inc. Sec. Litig.*, 324 F.Supp.2d 474, 491, 494 (S.D.N.Y. 2004) ("*Atlas*"); *In re Scottish Re Grp. Sec. Litig.*, 524 F.Supp.2d 370, 394 (S.D. N.Y. 2007); *Davidco Inv'rs LLC v. Anchor Glass Container Corp.*, 2006 U.S. Dist. LEXIS 11527, at *53-54 (M.D. Fla. Mar. 6, 2006). Here, Plaintiffs have alleged numerous triggering events known to Defendants when they reported inflated goodwill and intangible asset values beginning on December 1, 2015. Because Plaintiffs allege that Defendants "failed to take into account information that was available" to them when they made their statements, Defendants' fraud-by-hindsight arguments are meritless. *Atlas*, 324 F.Supp.2d at 494; *see Zwick*, 2018 U.S. Dist. LEXIS 97942, at *18 ("Plaintiffs have sufficiently alleged that Defendants' assurances (by their failures to test and take additional impairments) did not fairly align with the information in [Defendants'] possession at the time, and those allegations state a claim..."); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 680 (6th Cir. 2005) (no "fraud by hindsight" where basis of the impairment "were clearly facts reasonably (and actually) available to" defendants); *In re Rospatch Securities Litigation*, 760 F. Supp. 1239, 1249 (W.D. Mich. 1991) (rejecting fraud by hindsight argument in an impairment case).

Falsity is further supported by the close proximity between Defendants' misstatements and the revelation of the truth, and the magnitude of the impairment. *See, e.g.*, *Dudley*, 2013 U.S.

{00375817;11 }                                      16

Dist. LEXIS 61386, at *30-31 (finding "the magnitude of the impairment [and its timing] suggests that it should have been recorded earlier"). As late as March 6, 2017, Defendants reiterated when disclosing Ascena's 2Q17 results that there was no need for interim impairment testing and that Ascena's goodwill and trade names were unimpaired, despite (1) facing continued challenges that negatively impacted sales and were assumed to continue indefinitely, (2) decreasing guidance early in 2017, and (3) experiencing steady stock price declines, including from December 2016 through the end of 2Q17 that persisted through March.

Yet just over two months later, on May 17, the Company suddenly announced that it was undergoing an interim impairment test and expected to record a material impairment charge for the very same reasons it had dismissed just back in March.

The Court should also reject Defendants' argument that their disclosure of the underlying triggering events absolves their failure to timely impair their assets. *Dudley* rejected the same argument, reasoning that companies "would never have to record an impairment" under that rule, and that Defendants' compliance with "other disclosure obligations does not absolve [them] of [their] obligation to comply with GAAP." *Dudley*, 2013 U.S. Dist. LEXIS 61386, at *33.

Moreover, contrary to Defendants' claim, this is not a mere disagreement on accounting timing and judgment. *See* Defs' Mem. at 17-22. The relevant GAAP provisions summarized above "tolerate a range of 'reasonable' treatments[,]" but do not afford a company unlimited discretion in determining whether to perform an interim impairment test of goodwill. *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 465 (S.D.N.Y. 2005) ("Accounting may be an inexact science but … plaintiff has alleged that [defendant's] interpretation of the relevant accounting rule was unreasonable"). Here, Plaintiffs' claim is predicated on Defendants' refusal to conduct an

appropriate interim impairment test and take an impairment as of December 1, 2015, and when releasing quarterly and annual results throughout the rest of the Class Period. Defendants' failure to do so, and the belated write down announced on June 8, 2017, did not fall within a range of "'reasonable' treatments." *Thor*, 439 U.S. at 544.

Defendants are wrong that Plaintiffs must allege the exact dollar amount of the impairment they should have recorded earlier. Here, as Defendants' statements show, all of the indicators underlying their own impairment calculation announced on June 8, 2017 existed long before then. Accordingly, the well-pleaded allegations demonstrate that Defendants' own calculations underlying the belated impairments should have been carried out far earlier.[16]

The Court should also reject Defendants' argument that their misstatements were mere inactionable opinions. The Supreme Court held in *Omnicare* that statements of opinion are actionable either if they do not reflect the speaker's subjective belief (*i.e.*, the speaker does not "actually hold[] the stated belief"), *or* they omit known material information undermining that belief. *Omnicare*, 575 U.S. at 183-92.[17] The Complaint alleges both *Omnicare* prongs.

Here, GAAP and Ascena's policies required impairment testing when the existence of triggering events make it more likely than not that goodwill and other intangible assets are impaired. Defendants knew of the facts regarding the numerous triggering events showing that

---

[16] That Defendants conducted an annual impairment analysis, as disclosed in their 2016 Form 10-K, and warned that changes in performance may require interim testing and an impairment charge (Defs. Mem at 17-18), does not insulate them from liability. As explained herein, that analysis fraudulently inflated the Company's goodwill and other intangible assets, and falsely claimed, among other things, that those assets, including those of its ANN brands, were not impaired. "[T]he fact that [defendants] issued warnings that an impairment charge might be taken in the future did not relieve the Company from recording the impairment at the appropriate time." *Dudley*, 2013 U.S. Dist. LEXIS 61386, at *33-34; *see also Bauer v. Prudential Fin., Inc.*, 2010 U.S. Dist. LEXIS 64384, at *38 (D. N.J. June 29, 2010) ("warnings do not insulate Defendants from allegations that assets were already impaired, which Plaintiff clearly alleges").

[17] Courts within this district have found *Omnicare*'s reasoning relevant to Section 10(b) claims. *E.g.*, *In re Merck & Co.*, 2015 U.S. Dist. LEXIS 62983, at *21 (D.N.J. May 13, 2015).

{00375817;11 }                                    18

the goodwill and trade names were impaired. Indeed, Defendants have conceded that impairment indicators existed. Because their statements regarding goodwill and trade names had no basis, they are actionable under *Omnicare*. As shown above, Plaintiffs have adequately alleged that Defendants' assurances of unimpaired goodwill did not "fairly align[] with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 188-89. Defendants' representation of no goodwill impairment was made in the face of overwhelming contrary facts, rendering such disclosures actionable. *See Dudley*, 2013 U.S. Dist. LEXIS 61386, at \*32-\*34; *Zwick*, 2018 U.S. Dist. LEXIS 97942, at \*13-18.[18] Further, Plaintiffs have properly pleaded falsity through allegations that the factors that Defendants eventually pointed to on May 17, 2017 and June 8, 2017 as justifying interim impairment testing of the Company's goodwill and intangible assets— the challenging retail environment over the past couple of years, stock price declines, and reduced earnings forecasts—had all largely transpired in the quarters preceding that announcement. *See Zwick*, 2018 U.S. Dist. LEXIS 97942, at \*18; *see also In re Leapfrog Enter., Inc. Sec. Litig.*, 237 F. Supp. 3d 943, 955 (N.D. Cal. 2017) ("*Leapfrog*") (finding falsity "based on the allegations that Defendants justified the … impairment determination based on a significant stock decline [that] … had primarily taken place in the quarter [before] the impairment was taken]").

Defendants' argument that they hoped, contrary to objective evidence, that Ascena's performance would improve and that negative industry-wide trends and other headwinds would miraculously abate cannot be credited at this early stage in the proceedings. *See, e.g.*, *Zwick*, 2018 U.S. Dist. LEXIS 97942, at \*14-18; *In re Merck*, 2006 U.S. Dist. LEXIS 2345 at \*9. This

---

[18] Defendants' argument that *Omnicare* is inapposite and "makes no difference here because plaintiffs attack Ascena's goodwill reporting based on disclosed facts…[and] do not allege that defendants omitted facts that contradicted Ascena's goodwill reporting" (Defs' Mem. at 19 n. 12), is contradicted by Plaintiffs' allegations.

neither immunizes their statements nor justifies their failure to conduct interim impairment testing and take a write-down prior to May 17 and June 8, 2017, given the numerous triggering events they knew about. *See Omnicare, Inc.*, 575 U.S. at 188-89 (investors expect the opinion "fairly aligns with the information in the issuer's possession at the time.").[19]

The cases Defendants rely on are distinguishable and do not support dismissal. For instance, as explained above, unlike in *Nat'I Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517 (D.N.J. 2010) and *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. PLC*, 655 F. Supp. 2d 262 (S.D.N.Y. 2009), Plaintiffs here have alleged how much earlier Ascena should have recorded the impairment charge, the amount of such charge, and the triggering events justifying the impairment testing and charge.[20]

Further, even if Plaintiffs were required to show that the Defendants did not subjectively believe their opinion statements, the Complaint's scienter allegations satisfy that requirement. *See, e.g.*, *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 625 (S.D.N.Y. 2005) ("the falsity and scienter requirements are essentially combined").

---

[19] *See also Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 685-86 (5th Cir. 2014) (rejecting defendants' reliance on a "Hail Mary" defense and finding that defendants' hope that business would turn around neither justifies concealing adverse facts while awaiting that to occur nor negates the defendants' knowledge of adverse facts contradicting their public statements).

[20] *In re: KLX Securities Litigation*, 232 F.Supp.3d 1269 (S.D. Fla. 2017) is also distinguishable because the conditions that existed there, in quarters prior to the impairment charge and that were alleged to require an earlier impairment charge, were "several steps removed from the reasons" the company actually cited for the impairment. Here, however, the indicators that directly led Ascena to perform interim testing existed in the prior quarters. Nor does *City of Omaha, Nebraska Civilian Employees' Retirement System. v. CBS Corp.*, 679 F.3d 64 (2d Cir. 2012) ("*CBS*") support dismissal. Unlike in *CBS*, Plaintiffs here have alleged that Defendants' statements before, during, and after announcing the need for interim impairment testing reveal that they knew, or recklessly disregarded, that earlier, properly conducted testing would have shown that Ascena's goodwill and trade names were impaired before 3Q17. Further, the negative trends facing Ascena here were far more severe in terms of duration and magnitude than those in *CBS*, and, as explained herein, the timing and magnitude of the charge taken here and other allegations establish a strong inference of scienter. *City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*, 856 F.3d 605 (9th Cir. 2017), *Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004), and the other cases cited by Defendants (Defs' Mem. at 20-21 & n.21) are distinguishable for the same reasons.

---

{00375817;11 }                                    20

B.   **The Complaint Alleges A Strong Inference of Scienter**

The allegations of the Complaint raise a strong inference of scienter. In determining whether a party has plead scienter, the Court must consider "whether ***all*** of the facts alleged, ***taken collectively***, give rise to a strong inference of scienter[.]" *Tellabs, Inc.*, 551 U.S. at 322-23. Scienter may be established either by showing circumstantial evidence of conscious misbehavior or recklessness, or motive and opportunity. *In re PTC Therapeutics, Inc., Sec. Litig.*, 2017 U.S. Dist. LEXIS 137930, at *39-41 and n. 22 (D.N.J. Aug. 28, 2017) ("*PTC*") (McNulty, J.); *see also Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 n.8 (3d Cir. 2013).. To plead a strong inference of scienter, it is sufficient if the inference is one that is "***at least as likely as*** any plausible opposing inference." *Tellabs, Inc.*, 551 U.S. at 328. A "tie … goes to the plaintiff[.]" *Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 295 (S.D.N.Y. 2011)..

1.   **The Complaint Alleges Defendants Knew That an Impairment Was "More Likely Than Not" Via Their Knowledge of Triggering Events**

Plaintiffs may plead defendants' conscious misbehavior or recklessness by demonstrating that they had "knowledge of facts or access to information contradicting their public statements." *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). Specifically, a plaintiff adequately pleads that a defendant knowingly or recklessly failed to test for goodwill impairment by alleging (1) "a factual basis for the conclusion that an adjustment for the impairment in the value of [the goodwill] was warranted," and (2) "that the facts requiring the adjustment were known to [defendants]." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 343 (S.D.N.Y. 2004).

Relatedly, scienter can be alleged by identifying "red flags" that Defendants ignored. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("scienter may be found where there are specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice that the public statements were false"); *In re Atlas Air*, 324

F. Supp. 2d at 496 (same); *see also Suprema*, 438 F.3d at 279 ("allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss"); *In re Wilmington Tr. Sec. Litig*., 29 F. Supp. 3d 432, 449-50 (D. Del. 2014) ("*Wilmington*") (finding "red flags" and "the magnitude of the fraud, creates a strong and reasonable inference of [] scienter"). "A red flag creating a strong inference of scienter consists of '[a]n egregious refusal to see the obvious, or to investigate the doubtful.'" *PR Diamonds, Inc. v. Chandler*, 91 F. App'x. 418, 440 (6th Cir. 2004) (quoting *Novak*, 216 F.3d at 308)).

Here, when Defendants belatedly announced that interim impairment testing would be undertaken on May 18, 2017 and quantified the impairment on June 8, 2017, Defendants admitted they had access to information showing that ANN's goodwill and trade names were impaired and that they had ignored key impairment indicators. Those statements, coupled with Defendants' Class Period statements about deteriorating performance, contribute to and establish a strong inference of scienter. As explained above, the factors Defendants cited as justifying the decision to conduct interim impairment testing on May 8—"the challenging retail environment," Ascena's stock price decline, and forecasted earnings reductions (¶ 114)—all existed in the quarters prior to when the interim testing occurred. In particular, prior to those announcements, Defendants had discussed the sales challenges caused by the challenging retail environment, including retail environment headwinds/negative sector-wide traffic trends, the need to rely on promotions that decreased margins and revenue, and changes in customer preferences. Ascena's stock price had also experienced periods of sustained decline. Further, on June 8, Giammatteo provided additional detail confirming that Defendants were aware of objective facts—a significant change in the market environment—during the Class Period. On that day, he stated that "[t]his [impairment] charge represents a significant change in the market environment we've

seen over the past *couple of years.*" ¶ 125. Defendants' admitted knowledge of the impairment indicators is alone sufficient to give rise to a strong inference of scienter. Defendants' request that the Court interpret Giammatteo's June 8, 2017 admission in Defendants' favor (Defs' Mem. at 23-24) contradicts his statement, the facts, and the Court's requirement to take all allegations as true and draw all inferences in Plaintiffs' favor at this stage.

As discussed above, most of the impairment indicators identified under GAAP were triggered for Ascena and ANN. GAAP required Defendants to test for goodwill impairment if *any* triggering event, alone or in combination, made it more likely than not an impairment existed. This is overwhelming evidence that Defendants knew that Ascena's goodwill and indefinite intangible assets were "more than likely" impaired. Moreover, the Company's robust reporting systems and weekly meetings (¶¶ 126-129) afforded Defendants the knowledge that the Company was facing a continued downturn requiring an impairment.

Courts have sustained impairment claims and found scienter adequately pleaded based on allegations similar to those asserted here.[21] For example, in *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 321 F. Supp. 2d 1342 (N.D. Ga. 2004), the plaintiffs similarly alleged that defendants failed to timely take an impairment charge on certain assets because "based on the

---

[21] *See, e.g.*, *Dudley*, 2013 U.S. Dist. LEXIS 61386, at *47 (finding scienter for delayed impairment because, *inter alia*, four triggering events existed during the two quarters prior to when the impairment was taken); *Zwick*, 2018 U.S. Dist. LEXIS 97942, at *25-27 (finding scienter based on, *inter alia*, allegations of impairment indicators existing in the quarters prior to the impairment charges being taken, including deterioration in financial performance, increased competition, and decreased share price); *Leapfrog*, 237 F. Supp. 3d at 954 (finding scienter adequately pleaded where "Defendants justified the [] impairment write-off in 4Q based on an obvious stock decline,… [that] was obvious as of 3Q or shortly thereafter"); *see also, e.g.*, *Omnicom*, 2005 U.S. Dist. LEXIS 5272 at *27 (plaintiffs adequately alleged scienter based on failure to timely recognize an impairment charge in violation of GAAP); *In re Flag Telecom.*, 352 F.Supp.2d at 465-66 ("impairment charge…should have been taken sooner than it was" where, *inter alia*, management acknowledged the market had "imploded"); *Davidco Inv'rs*, 2006 U.S. Dist. LEXIS 11527, at *60 (plaintiffs alleged scienter where, as here, they "pointed to facts" showing that "defendants knew or recklessly disregarded that the assets …were impaired").

negative economic environment, an impairment review [of the company's] assets … would have required [it] to record the[] charges a quarter earlier." *Id.* at 1352. As here, the plaintiffs pointed to adverse facts that existed in the prior quarters and indicated that the assets were impaired, such as continued poor performance. *Id.* at 1352 n.5. The court sustained plaintiffs' impairment claims, finding that the "allegations made clear that the need to write down was so apparent to Defendants that a failure to take earlier write-downs amounted to fraud." *Id.* at 1352.

While unnecessary to plead scienter here, Defendants' statements about significant impairment indicators long before the write-downs reflect their knowledge of "red flags" and further support an inference of scienter. *See, e.g.*, *Suprema.,* 438 F.3d at 279; *Zwick*, 2018 U.S. Dist. LEXIS 97942, at *25-27.

Defendants' reliance on *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, 2010 U.S. Dist. LEXIS 30693, at *43 (E.D. Wis. Mar. 30, 2010) (Defs' Mem. at 22-23), is misplaced. There, the plaintiffs alleged that financial reports over a five-year period were false due to the failure to write-down goodwill, but "ma[d]e no attempt to differentiate between the vastly different circumstances surrounding each reporting period." *Id.* at *42-43. Here, the Complaint details the circumstances in each quarter showing that ANN's goodwill and trade names were impaired. The actual allegations raised here show that this is not, as Defendants claim, a case in which Plaintiffs are merely "second-guessing in hindsight a company's judgment about when those trends become bad enough to warrant impairment testing." Defs' Mem. at 23.

### 2.    The Impairment's Magnitude and Timing Are Evidence of Scienter

The magnitude and timing of impairment charges have been found to contribute to a strong inference of scienter, particularly when coupled with additional allegations like those discussed above in the preceding section. *See, e.g.*, *Leapfrog*, 237 F. Supp. 3d at 954 (strong inference of scienter arises from "allegations related to the timing and size of the impairment"

and stock price decline in quarter preceding impairment); *Dudley*, 2013 U.S. Dist. LEXIS 61386, at *30-31 (finding the "the magnitude of the impairment suggests that it should have been recorded earlier"); *Wilmington*, 29 F. Supp. 3d at 449-450; *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 176-77 (S.D.N.Y. 2003) (The magnitude of sudden goodwill impairments "support[s] a reasonable belief that…impairments…should have been reported [earlier], but were not."). This is because "[g]oodwill does not go from being unimpaired to fully impaired overnight." *Dudley*, 2013 U.S. Dist. LEXIS 61389, at *30-31. Here, as shown above, the magnitude of the June 8, 2017 impairment charge was stunning. For example, it wiped out $428.9 million (over 60%) of the $733.9 million in goodwill Defendants had previously assigned to ANN and reduced by more than half the value of ANN's trade names. *E.g.*, ¶ 132.

The close proximity between Defendants' misstatements, including reiterating on March 6, 2017 that ANN's goodwill and intangible asset values remained unimpaired as of 2Q17, and Defendants' revelation of the contrary truth is yet additional strong evidence of scienter. *See, e.g.*, *Dudley*, 2013 U.S. Dist. LEXIS 61386, at *31-32; *Leapfrog*, 237 F. Supp. 3d at 954.

### 3. ANN is a Core Operation of Ascena

"[K]nowledge may be imputed to [] defendants when the disclosures involve the company's core business." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001). Here, ANN was Ascena's largest segment, responsible for approximately 33% of its total net sales (¶ 131) and "increasing its revenue base by more than 50%" (¶ 37). Thus, the inference of scienter created by Defendants' knowledge of the information misrepresented to investors and the magnitude and timing of the write-downs discussed above, is bolstered by the fact that ANN was a core operation. *See, e.g.*, *De Vito*, 2018 U.S. Dist. LEXIS 217963, at *96-98.

### 4.       Ascena and Jaffe Had Motive to Delay the Impairment

Motive is not necessary to plead scienter. *Tellabs*, 551 U.S. at 325; *see also Avaya*, 564 F.3d at 259 (cautioning against placing undue weight on "the presence or absence of certain types of allegations"). Even still, Jaffe was motivated to not take a timely write-down in order to avoid admitting his failure and accepting responsibility for the crisis facing the company his parents founded. ¶ 133. This motive bolsters the strong inference of scienter.

### C.       The Complaint Sufficiently Alleges Loss Causation

Loss causation is not subject to "the PSLRA or Rule 9(b)'s heightened pleading requirements[.]" *In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, 2017 U.S. Dist. LEXIS 66037, at *39 (D.N.J. Apr. 28, 2017). The "ordinary pleading rules [applicable to loss causation] are not meant to impose a great burden upon a plaintiff." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). "Plaintiff may adequately plead loss causation by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price decline." *Wilmington*, 29 F. Supp. 3d at 450. "The Third Circuit has repeatedly cautioned that this determination is a fact-sensitive inquiry typically left to the trier of fact." *Omanoff v. Patrizio & Zhao LLC*, 2015 U.S. Dist. LEXIS 43086, at *14 (D.N.J. Mar. 31, 2015); *accord De Vito*, 2018 U.S. Dist. LEXIS 217963, at *107.

Here, Defendants' attack on loss causation (*see* Defs' Mem. at 28-30) is merely a "truth on the market defense." *See Zwick*, 2018 U.S. Dist. LEXIS 97942, at *29 ("Defendants [] contend that the information upon which their decisions were based, information Plaintiffs allege should have triggered testing, was publicly known. This assertion is a 'truth-on-the-market'

defense.").[22] "Because this argument is intensely fact-specific, it is not appropriate for the Court to consider it [at this stage]." *Id.*; *accord Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Here, even assuming all the relevant financial data were public, recovery would not be barred, because investors are not in a position to evaluate a company's goodwill or intangible asset valuations in the same manner as management. Defendants' argument should accordingly be rejected. *See, e.g.*, *Zwick*, 2018 U.S. Dist. LEXIS 97942, at *29-30 (rejecting argument that information relevant to goodwill impairment charge was sufficiently disclosed to the market).

Here, there can be no reasonable dispute that the May 17, 2017 disclosure of the need for interim impairment testing likely to result in large impairments was "new" information. Indeed, Defendants' argument is easily disproven by the fact that Ascena's stock price declined 26% following that announcement. *See* ¶ 118. The decline proves Defendants' concealment and investors' lack of knowledge, and Plaintiffs have properly alleged loss causation. *See, e.g.*, *De Vito*, 2018 U.S. Dist. LEXIS 217963, at *108-09 ("These corrective disclosures are intimately tied to the earlier misstatements outlined in plaintiffs' complaint. The corresponding stock price movement, given its nature and timing, is sufficient to support an inference of loss causation."); *Omanoff*, 2015 U.S. Dist. LEXIS 43086, at *14-16 (finding "Plaintiffs have sufficiently pled loss causation by alleging that the disclosures between April 1, 2011 …, and October 7, 2011 (the date the class period closed), partially disclosed the misrepresentations that were fully revealed on October 20, 2011"); *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J.

---

[22] *See also Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1185 n.25 (C.D. Cal. 2011) ("The 'truth on the market' defense can fairly be characterized as a defense to materiality, reliance, or loss causation, or as a separate affirmative defense. However characterized, it requires a fact-intensive inquiry that is better reserved for summary judgment").

2006) (loss causation requirement satisfied through allegation "that the price of Bradley;s stock dropped after the truth regarding Defendants' alleged misrepresentations became known").[23]

Defendants' bare speculation that other non-fraud factors may have contributed to the large decline in Ascena's stock price following its May 17, 2017 announcement (Defs' Mem. at 28, 30 n. 14) does not defeat loss causation. As this Court has found, a complaint need not "plead facts indicating that disclosure of the alleged fraud was the sole reason for the investment's decline in value" and "it is not possible or even necessary to back out confounding causes at … [this] stage." *De Vito*, 2018 U.S. Dist. LEXIS 217963, at *107, 109-10. It "is a factual argument for a later day and does not diminish the [Complaint's] sufficiency." *In re Delcath*, 36 F. Supp. 3d 320, 336 (S.D.N.Y. 2014). This is because, here, "plaintiffs have offered sufficient evidence to show that the misrepresentations were plausible reasons for the decline in value" and new corrective information was disclosed on May 17. *Wilmington*, 29 F. Supp. 3d at 450.[24]

## III. Plaintiffs' Claims are Timely

The statute of limitations applicable to the § 10(b) claims asserted here is "2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1). The limitations

---

[23] In *In re Bradley*, the Court found loss causation adequately alleged through a series of post-class period disclosures, one of which resulted in a stock price increase, finding "[t]he revelation of the 'truth'… did not take the form of a single, unitary disclosure, but occurred through a series of disclosing events." *Id.* at 828-29. Similar to here, the first disclosure revealed that the company's accounting (revenue recognition) practices were under investigation and its financial statements could not be relied upon, causing a 26% stock price decline. That disclosure "partially disclosed what the alleged misrepresentations had concealed from the market and began to reveal to the market place what [the next release announcing and quantifying an earnings restatement] later confirmed" but was followed by a gain in stock price. The Court noted that the stock price gain following the second disclosure was not fatal to loss causation given the "market corrected the price of Bradley's stock [] when the truth began to leak out" two months prior. *Id.*

[24] Plaintiffs are not, as Defendants claim, "[s]imply pointing to a stock price drop" to plead loss causation. Defs' Mem. at 28. In fact, Plaintiffs allege that the release of new information beginning on May 17 corrected the previously undisclosed truth that Ascena's goodwill and intangible assets were impaired throughout the Class Period. *E.g.*, ¶¶5-10, 114-120, 150. Defendants' reliance on *CBS*, which addressed the reliance element and found it insufficiently pleaded and undermined by concessions at oral argument not made here, is thus misplaced.

period only begins to run when a reasonably diligent plaintiff would have discovered the facts constituting the violation, ***including all elements*** under section 10(b). *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010); *Hull v. Glob. Dig. Sols., Inc.*, 2017 U.S. Dist. LEXIS 208191, at \*25 (D.N.J. Dec. 19, 2017). Moreover, determining "the timing of a plaintiff's knowledge of his claim is a fact-intensive inquiry" generally inappropriate for resolution at this stage. *De Vito*, 2018 U.S. Dist. LEXIS 217963, at \*71. Defendants who raise the statute of limitations face a heavy burden. *Gruber v. Price Waterhouse*, 911 F.2d 960, 963 (3d Cir. 1990).

Defendants do not come close. As explained above, it was not until the June 8, 2017 disclosure quantifying the massive impairment and the business segment in which it occurred that a reasonably diligent plaintiff would have discovered facts permitting it to plead a viable claim, particularly with respect to scienter. In fact, Giammatteo acknowledged on that date that the need to take an impairment was based on trends Ascena observed ***for years***. As the Complaint was filed less than two years after June 8, 2017—on June 7, 2019—Plaintiffs' claims are timely. *See De Vito*, 2018 U.S. Dist. LEXIS 217963 at \*66-72; *Omanoff*, 2015 U.S. Dist. LEXIS 43086, at \*16-18. This Court should thus reject the argument that Plaintiffs' claims are time-barred.[25]

Defendants' claim that "the face of the complaint demonstrates that the [] claims are untimely" (Defs'. Mem. at 15) is incorrect, and their reliance on *Stephens v. Clash*, 796 F.3d 281, 288 (3d Cir. 2015) for that proposition is misplaced. In *Stephens*, the plaintiff asserted claims arising from the parties' sexual relationship that occurred while the plaintiff was underage. *Id.* at 283. The complaint there, on its face, showed that the plaintiff discovered all

---

[25] *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263 (3d Cir. 2013) (Defs' Mem. at 14-15) is distinguishable because the misconduct alleged here was not asserted by other plaintiffs two years before this action was filed. *See id.* at 277.

elements of the claim, sufficient to trigger the running of the statute of limitations, as of the time the plaintiff and defendant willingly engaged in a sexual relationship. *See id.* at 288-89. Here, however, the Complaint shows that it was not until at least June 8, 2017 that a reasonable plaintiff would have discovered the facts needed to properly plead the claims at issue.

## IV.   The Complaint Adequately Alleges Section 20(a) Control Person Liability Claims

Defendants' sole argument for dismissing the § 20(a) claim rests on the incorrect assumption that Plaintiffs failed to state a § 10(b) violation. The § 20(a) claim should thus be sustained. *E.g.*, *PTC*, 2017 U.S. Dist. LEXIS 137930, at *48.

## V.   Leave to Amend Should Be Allowed

If the Court grants the motion, Plaintiffs respectfully request the initial dismissal be without prejudice as this Court has done in other securities class actions. *See, e.g.*, *In re Galema Biopharma, Inc. Sec. Litig.,* 336 F. Supp. 3d 378, 394 (D.N.J. 2018) (McNulty, J.); *Padgettt v. RIT Techs. Ltd.*, 2019 U.S. Dist. LEXIS 28996, at *21 (D.N.J. Feb. 22, 2019) (McNulty, J.).

## CONCLUSION

For these reasons, Plaintiffs respectfully submit that Defendants' Motion to Dismiss should be denied in its entirety.

DATED: May 22, 2020                    Respectfully submitted,

                                       */s/ Christopher A. Seeger*
                                              Christopher A. Seeger
                                       CHRISTOPHER A. SEEGER
                                       DAVID R. BUCHANAN
                                       CHRISTOPHER L. AYERS
                                       SEEGER WEISS LLP
                                       55 Challenger Road, 6th Floor
                                       Ridgefield Park, NJ 07660
                                       Telephone: 973/639-9100
                                       973/584-9393 (fax)
                                       seeger@seegerweiss.com
                                       dbuchanan@seegerweiss.com
                                       cayers@seegerweiss.com

{00375817;11 }                                30

*Local Counsel*

POMERANTZ LLP
JEREMY A. LIEBERMAN
MURIELLE J. STEVEN WALSH
ERIC D. GOTTLIEB (*PHV* application forthcoming)
600 Third Avenue
New York, NY 10016
Telephone: 212/661-1100
917/463-1044 (fax)
jalieberman@pomlaw.com
mjsteven@pomlaw.com
egottlieb@pomlaw.com


POMERANTZ LLP
PATRICK V. DAHLSTROM
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312/377-1181
312/229-8811 (fax)
pdahlstrom@pomlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
VICKI M. DIAMOND
LINDSAY LA MARCA
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367/1173 (fax)
srudman@rgrdlaw.com
vdiamond@rgrdlaw.com
llamarca@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
NOAM MANDEL
30 Vesey Street, Suite 200
New York, NY 10007
Telephone: 212/693-1058
212/693-7423 (fax)
noam@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs*

{00375817;11 }                        31

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: 770/200-3104
770/200-3101(fax)
michaelf@johnsonfistel.com

*Additional Counsel for Lead Plaintiff Joel Patterson*

BRONSTEIN, GEWIRTZ &
  GROSSMAN, LLC
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: 212/697-6484
212/697-7296 (fax)
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff Michaella
Corporation*

{00375817;11 }                                    32

**CERTIFICATE OF SERVICE**

I, CHRISTOPHER A. SEEGER hereby certify that on May 22, 2020, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Christopher A. Seeger*
Christopher A. Seeger

{00375817;11 }