## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

In re ASCENA RETAIL GROUP, INC. SECURITIES LITIGATION

Civ. No. 19-13529 (KM) (JBC)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiffs Joel Patterson and Michaella Corporation bring a putative securities class action against David Jaffe and Robert Giammatteo, formerly senior executives at Ascena Retail Group, Inc. ("Ascena"), a publicly traded retailer of clothing and apparel. Plaintiffs allege that from December 2015 to May 2017, Jaffe and Giammatteo misrepresented the value of Ascena's goodwill and tradenames in order to artificially inflate Ascena's stock price. In June 2017, Ascena announced an impairment charge to these assets, reducing their declared value by over $1.3 billion and causing Ascena's already-declining share price to fall precipitously. Ascena ultimately declared Chapter 11 bankruptcy in July 2020.

Now before the Court is Defendants' motion to dismiss the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). (DE 47).[1]

---

[1]     Certain citations to the record are abbreviated as follows:

"DE" refers to the docket entry numbers in this case

"Compl." or "Complaint" refers to Plaintiff's Consolidated Amended Complaint. (DE 42.)

"Mot." refers to Defendants' memorandum of law in support of their motion to dismiss Plaintiff's consolidated amended complaint. (DE 47-1.)

"Op." refers to Plaintiff's memorandum of law in opposition to Defendants' motion to dismiss. (DE 49.)

Defendants argue that Plaintiffs have failed to plead material misrepresentation or scienter, both essential elements of their claims. For the following reasons, Defendants' motion to dismiss the complaint is **GRANTED**. However, Plaintiffs will be permitted the opportunity to amend their complaint.

## I.   BACKGROUND

I summarize the allegations of the complaint, which, for purposes of this motion to dismiss, are taken as true. *See* Section II, *infra.*

## A. Facts

Ascena, a publicly traded clothing and apparel retailer, is incorporated in Delaware, with its principal place of business in New Jersey. (Compl. ¶¶ 16, 25-26.) Jaffe served as Ascena's CEO, president, and board chairman from 2002 to 2019; Giammatteo served as its CFO and executive vice president from 2015 to 2019. (*Id.* ¶¶ 17-18, 27.) Both Plaintiffs purchased shares of Ascena's common stock between December 1, 2015, and May 17, 2017 (the "Class Period"). (*Id.* ¶ 15.)

Plaintiffs allege that under Jaffe's leadership, Ascena embarked on an "expansion-driven strategy" of acquiring other women's clothing companies, culminating in May 2015 with Ascena's acquisition of ANN, the parent company to the clothing brands Ann Taylor and LOFT. (Compl. ¶¶ 27-35.) From December 2015 to May 2017, Ascena reported in SEC filings that the value of Ascena's goodwill and tradenames, including those of ANN, remained relatively stable, the value of its goodwill ranging from $1.268 billion to $1.29 billion while the value of its other intangible assets, including tradenames,

---

"Supp. Memo" refers to Defendants' supplemental memorandum of law in support of their motion to dismiss Plaintiff's consolidated amended complaint. (DE 68.)

"Supp. Op." refers to Plaintiff's supplemental memorandum of law in further opposition to Defendants' motion to dismiss. (DE 69.)

"Reply" refers to Defendants' supplemental reply memorandum of law in support of their motion to dismiss Plaintiff's consolidated amended complaint. (DE 70.)

ranged from $1.263 billion to $1.283. Nevertheless, Plaintiffs allege, during the same period, "key metrics underlying the value of [Ascena's] goodwill and other intangible assets" deteriorated; negative factors included "declining sales and store traffic, declining comparable sales,[2] a shift in consumer spending, [] a drastically altered competitive environment, [and] a steady decline in [Ascena's] stock price and market capitalization." (*Id.* ¶¶ 51-54.) Defendants ultimately acknowledged the effect of these key metrics on the value of Ascena's goodwill and tradenames in June 2017, when it announced an impairment charge of over $1.3 billion to these assets. (*Id.* ¶¶ 6-10.) According to Plaintiffs however, Defendants knew that under the Generally Accepted Accounting Principles ("GAAP") used by public companies, these metrics demonstrated the need for an impairment analysis and an impairment charge much sooner. Defendants, they allege, delayed in order to inflate Ascena's share price, misrepresenting the value of Ascena's assets and violating GAAP in the process.[3] (*Id.* ¶¶ 42-49, 55-57.)

Plaintiff's evidence for these claims consists primarily of Ascena's SEC filings and the public statements of Jaffe and Giammatteo regarding the financial results that these SEC filings announced. In sum, they urge that Ascena's financial statements to the SEC, each of which was signed by Jaffe and Giammatteo, repeatedly overstated the value of ANN's goodwill and tradenames, while stating, incorrectly, that the statements contained "all normal and recurring adjustments" and disclosed information necessary to fairly present the state of Ascena's business.[4] (Compl. ¶¶ 61, 63, 67, 69, 72,

---

[2]     Ascena "generally defines" comparable sales as the change in sales figures in a given period as compared with the same time period during the prior year. (Compl. ¶ 53 n.6.)

[3]     GAAP is published by The Financial Accounting Standards Board and codifies the accounting standards that have been adopted by the Securities and Exchange Commission. (Compl. ¶ 41.)

[4]     Ascena's SEC filings also stated, in describing their assessment of goodwill, that to the extent that Ascena paid more for acquiring ANN than ANN's assets were actually worth, "Ascena would contribute that excess amount to the Company's goodwill and

77, 79, 88, 96, 101, 109.) Plaintiffs urge that these filings and Defendants'
associated public statements demonstrate that Defendants knew an
impairment analysis was necessary and required by GAAP as early as
December 2015. (*Id.* ¶¶ 62, 67, 70, 72-78, 89-93, 102-06, 110-11.) An abridged
timeline of these filings is presented below.

### 1. First Quarter of Fiscal Year 2016

On December 1, 2015, Ascena filed its financial disclosures for the first
quarter of fiscal year 2016, stating that of ANN's value, $953.2 million was
attributable to goodwill and $815 million was attributable to its trade names.
(Compl. ¶ 58.) This filing noted that the valuation of goodwill was subject to
change within the next year and likely to be finalized in the spring of 2016. (*Id.*
¶ 60.) That same day, December 1, 2015, Jaffe stated during a conference call
with investors and business analysts that Ann Taylor's comparable sales were
down 4%. (*Id.* ¶ 62.)

### 2. Second Quarter of Fiscal Year 2016

On March 1, 2016, Ascena filed its financial disclosures for the second
quarter of fiscal year 2016 in which it reported that its goodwill, including the
goodwill of ANN, was valued at $1.268 billion and the net value of its other
intangible assets, including ANN's tradenames, was $1.283 billion. (Compl.
¶ 65.) The filings noted that the valuation of goodwill and other assets was not
yet final but that Ascena did not expect any changes to be material. (*Id.* ¶ 66.)
Ascena also reported in this filing a net loss of $0.12 per diluted share (*id.*
¶ 65), and Jaffe stated during a conference call with investors and business

---

report it as goodwill on Ascena's balance sheet." (Compl. ¶¶ 60, 94-95.) These filings
also frequently state that the value assigned to ANN's goodwill "consists largely of the
synergies and economies of scales expected from integrating ANN's operations."
(Compl. ¶¶ 60, 66.) As for the assessment of tradenames' value, specifically Ann Taylor
and LOFT, Ascena's filings note that such a valuation is subject to an impairment
assessment annually, or more frequently if events or changes in circumstances
indicate that the asset may be impaired." (Compl. ¶¶ 59, 94-95.)

analysts held the same day that Ascena's comparable sales were down 1% overall (*id.* ¶ 68).

### 3. Third Quarter of Fiscal Year 2016

On May 31, 2016, Ascena filed its financial disclosures for the third quarter of fiscal year 2016, in which it reported that its goodwill remained valued at $1.268 billion but that the value of ANN's goodwill had been reduced by approximately $5 million, to $948.2 million. (Compl. ¶ 71.) Further, Ascena's filings stated that the net value of its other intangible assets was $1.275 billion, an $8 million decrease from the previous quarter. Finally, Ascena reported earnings of $0.08 per diluted share, as compared with earnings of $0.15 per diluted share in the same period the prior year. (*Id.* ¶ 71.)

On a conference call with investors and business analysts the same day, both Jaffe and Giammatteo acknowledged that Ascena was facing increased difficulties in its business, including a 1% drop in comparable sales. (Compl. ¶ 76.) Both Defendants stated that they expected Ascena's earnings to continue declining and Jaffe remarked that "the environment this Spring has been challenging . . . [and] we were not able to fully mitigate these challenges." (*Id.* ¶¶ 73-74, 76.)

### 4. Fourth Quarter and Annual disclosures for Fiscal Year 2016

On September 19, 2016, Ascena filed its annual financial disclosures for fiscal year 2016, in which it reported that its goodwill was valued at $1.279 billion, an $11 million increase from the prior quarter, and that the net value of its other intangible assets was $1.268 billion, a $7 million decrease from the prior quarter. (Compl. ¶ 80.) As for ANN, Ascena reported that the value of its goodwill was $733.9 million, a $225.7 million reduction since the prior quarter. (*Id.* ¶ 81.) This filing noted that the valuation of goodwill would be finalized in the following quarter. (*Id.* ¶ 81.) Moreover, this filing noted that Ascena had performed its annual impairment assessment of its goodwill and intangible assets, noting that although "negative industry or general economic trends, disruptions to our business[,] and unexpected significant changes or planned

changes in our use of [] assets" might undermine the value of goodwill or tradenames, Ascena nonetheless concluded that "no impairment charges were deemed necessary." (*Id.* ¶¶ 83-87.) Finally, Ascena reported earnings of $0.07 per diluted share over the fourth quarter and an overall loss of $0.06 for the 2016 fiscal year. (*Id.* ¶ 80.)

These announcements prompted Ascena's stock to fall from $8.12 per share to $5.69 per share, approximately a 30% drop, in one day. (Compl. ¶¶ 83-97.) Jaffe reiterated in a conference call with business analysts and investors the same day that Ascena's fiscal year 2016 had proven "challenging" and that Ascena's sales had continued to decline. (*Id.* ¶¶ 89-90.) Jaffe also noted that sales at Ann Taylor and LOFT were down significantly over the past year and that some brick-and-mortar stores would close in the coming fiscal year as a result. (*Id.* ¶¶ 92-93.)

### 5. First Quarter of Fiscal Year 2017

On December 1, 2016, Ascena filed its financial disclosure for the first quarter of fiscal year 2017, in which it reported that its goodwill remained valued at $1.279 billion and the net value of its other intangible assets was $1.263 billion, a $5 million decrease since the prior quarter. (Compl. ¶¶ 98-99.) As for ANN, Ascena reported that it had finalized its assessment of goodwill and tradenames, concluding that ANN's goodwill was $959.6 million and its tradenames were $815 million—figures well above Ascena's estimates in the prior quarter but in line with those it had initially announced in December 2015. (*Id.* ¶ 100.) Ascena also reported earnings of $0.07 per diluted share. (*Id.* ¶ 100.)

These financial results prompted both Jaffe and Giammatteo to publicly comment on Ascena's continuing declines in sales and store traffic. (Compl. ¶¶ 104-06) Jaffe stated in both a conference call with investors and in a press release that sales and consumer demand had continued falling, noting that "LOFT's comp[arable] sales were down 3% on an 8% store traffic decline, and

Ann Taylor comp[arable] sales were down 11% on a 13% decline in store traffic." (*Id.* ¶¶ 104, 106.)

### 6. Second Quarter of Fiscal Year 2017

On March 6, 2017, Ascena filed its financial disclosure for the second quarter of fiscal year 2017, in which it reported that its goodwill remained valued at $1.279 billion and the net value of its other intangible assets was $1.27 billion, a $7 million increase over the last quarter. (Compl. ¶¶ 107-08.) Ascena also reported a net income of $0.18 per diluted share. (*Id.* ¶ 100.) Despite these nominally positive results, Jaffe stated in both a press release and conference call that Ascena continued to face trends like falling store traffic and "overall customer price sensitivity" that had "become persistent issues" and that Ascena's "traditional brick and mortar" stores were being further challenged by increased competition from online retailers. (*Id.* ¶¶ 112-13.)

### 7. Ascena Announces an Impairment Analysis and Charge

On May 17, 2017, Ascena announced that it was in the process of completing an impairment analysis on its goodwill and intangible assets that had been necessitated by "the challenging retail environment, the decline in [its] stock price, and the reduction in [its] forecasted earnings"—trends that Plaintiffs now argue were evident throughout the Class Period. (Compl. ¶¶ 114-15.) The press release announcing this impairment analysis also reported that Ascena had lowered its earnings expectations, anticipating an 8% drop in comparable sales for the third quarter 2017 and between a 6% and 7% drop for the year. (*Id.* ¶¶ 116-17.) Following these announcements, Ascena's share price fell by 26%, from $2.82 to $2.06 per share. (*Id.* ¶ 118.)

On June 8, 2017, Ascena announced its third quarter financial results, indicating that its quarterly losses included "a non-cash pre-tax impairment charge of $1.324 billion" against Ascena's goodwill and tradenames. (Compl. ¶ 119.) This write-down was significant in both absolute and relative terms— Ascena's total assets in fiscal year 2016 were worth approximately $5.5 billion,

so the impairment charge to Ascena's goodwill and tradenames wiped out nearly 25% of its value. (*Id.* ¶ 132.) During a conference call hosted by Ascena the same day, Giammatteo acknowledged that this impairment charge represented changes in Ascena's "market environment" that had occurred "over the past couple of years." (*Id.* ¶ 120.)

### B. Procedural History

On November 21, 2019, Plaintiffs filed the currently operative Consolidated Amended Complaint, alleging that Jaffe and Giammatteo violated Section 10(b) of the Exchange Act and Rule 10b-5 ("Count 1") and Section 20(a) of the Exchange Act ("Count 2") by knowingly or recklessly overstating the value and business prospects of ANN and its subsidiaries in public statements and SEC filings. (Compl. ¶¶ 1-2, 5-10, 147-54.) Plaintiffs filed this class action suit on behalf of anyone who acquired Ascena common stock from December 1, 2015, when Defendants allegedly began misrepresenting Ascena's value in SEC filings, until May 17, 2017, when Ascena announced that it would perform an impairment analysis of its goodwill and tradenames. (*Id.* ¶¶ 1, 9-10, 58-61.)

Defendants filed their motion to dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6) on February 7, 2020. On July 27, 2020, Defendants notified this Court that Ascena had filed for bankruptcy pursuant to 11 U.S.C. §§ 101–1532 in the Eastern District of Virginia and so Defendants' motion to dismiss was administratively terminated. (DE 58, 59.) On March 3, 2022, the United States Bankruptcy Court for the Eastern District of Virginia entered an order confirming a Chapter 11 bankruptcy plan for Ascena which, among other provisions, discharged Ascena from Plaintiffs' claims in this suit. (DE 62.) Accordingly, on April 5, 2022, I ordered that all claims against Ascena be dismissed with prejudice and that Defendants' motion to dismiss be renewed on behalf of Jaffe and Giammatteo only. (DE 63.)

Defendants now argue that Plaintiffs' complaint lacks sufficient factual allegations that Jaffe or Giammatteo knew their statements about Ascena and its acquisition of ANN were untrue, lacked a reasonable basis, or otherwise

8

omitted material non-public information. (Supp. Memo. at 1-2.) Moreover, Defendants urge that Plaintiffs have also failed to plead the necessary scienter, neglecting to offer sufficient facts or any "cogent and compelling" theory as to that element. (*Id.* at 2.) Without such allegations, Defendants maintain that Plaintiffs' claims must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## II.   LEGAL STANDARDS

Under Fed. R. Civ. P. 12(b)(6), the Court may dismiss a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). On such a motion, the well-pleaded factual allegations of the complaint must be taken as true, with all reasonable inferences drawn in plaintiff's favor. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

To state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

A plaintiff asserting securities-fraud claims pursuant to Section 10(b) of the Securities Exchange Act and Rule 10b-5 must meet the heightened pleading standard as set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA").[5] 15 U.S.C. § 78u-4(b). Under the PSLRA, a complaint alleging a false or misleading statement must: "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is

---

[5]   The purpose of these heightened requirements is "to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 n.8 (3d Cir. 2006) (quoting *In re Advanta*, 180 F.3d 525, 531 (3d Cir.1999)).

misleading,' 15 U.S.C. § 78u-4(b)(1), and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' *Id.* § 78u-4(b)(2)." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 (3d Cir. 2013) (quoting *Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308, 321 (2007)) (internal quotations omitted). The required state of mind is "scienter," which is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319.

That PSLRA "particularity" standard has elements in common with the heightened pleading requirements for fraud set forth in Federal Rule of Civil Procedure 9(b). *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009); Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Rule 9(b), however, is both subsumed and supplemented by the requirements of Section 78u-4(b)(1) of the PSLRA. *Avaya, Inc.*, 564 F.3d at 253 (citing *Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 n.5 (1st Cir. 2008)). Like Rule 9(b), the PSLRA incorporates a requirement that a plaintiff plead the "who, what, when, where and how." *Id.* But the PSLRA also exceeds the requirements for pleading scienter contained in Rule 9(b), which permits such mental states to be alleged generally. *Id.*

As interpreted by the Supreme Court, the PSLRA's rigorous particularity requirement requires that the facts pleaded give rise to a "strong inference" of scienter. A court considering a motion to dismiss for failure to plead scienter must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24. A "strong inference" of scienter must thus be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314, 324. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 324 (internal quotation marks omitted). The pertinent question is "whether all of the facts alleged, taken collectively, give rise to a

10

strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23; *see also id.* at 325 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Omissions and ambiguities "count against inferring scienter." *Id.* at 326.

## III.   DISCUSSION: SECTION 10(b) CLAIM (COUNT 1)

Section 10(b) of the Securities Exchange Act forbids the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance" that violates SEC rules or regulations. 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements this section by declaring the following practices unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person
>
> in connection with the purchase or sale of any security.

17 CFR § 240.10b–5.

As noted above, for Plaintiffs to successfully make out a claim under Section 10(b) and its companion Rule 10b-5, they must allege both "a material misrepresentation or omission" and "scienter." *Edinburgh*, 754 F.3d at 167. Defendants urge that Plaintiffs have failed to plead such elements as required by the PSLRA and thus that the complaint must be dismissed.

### A. Material misrepresentation

At the heart of Plaintiffs' claim is their allegation that Ascena's financial disclosures during the Class Period contained materially false or misleading statements regarding Ascena's goodwill and tradename value, particularly that of its subsidiary ANN. (Compl. ¶¶ 2, 5-6; Supp. Op. at 1-2.) In particular, they argue that Defendants overstated the value of Ascena's assets in financial disclosures during the Class Period despite multiple contemporaneous

indicators that its assets were impaired, including: (1) deteriorating performance of Ascena's businesses; (2) shifts in consumer behavior and spending; (3) changes in Ascena's commercial strategy; and (4) the continued decline of Ascena's share price. (Compl. ¶¶ 51-54, 62, 68, 71, 73-76, 80, 84, 87, 89-93, 97, 104-06, 112-13; Supp. Op. at 4.)

 Defendants counter that Plaintiffs' complaint lacks "a single particularized allegation" to show that Jaffe or Giammatteo "personally disbelieved Ascena's opinions about its goodwill, or that the challenged statements omitted material non-public information." (Supp. Memo. at 1, 3-4.) Indeed, they note that Jaffe and Giammatteo repeatedly told investors of the difficulties with Ascena's business and that Ascena's annual impairment test in September 2016 gave both of them a reasonable basis to believe that the values assigned to Ascena's goodwill and tradenames were correct. (Supp. Memo. at 4-5.) As such, they argue that Plaintiff's complaint simply assumes that Defendants doubted Ascena's valuation of goodwill and tradenames "based on plaintiffs' retrospective disagreement with Ascena's judgments," an impermissible theory of "fraud-by-hindsight." (Supp. Memo. at 1-2, 5 (citing *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 659 (D.N.J. 2021) ("Allegations that a company's later financial difficulties imply that earlier financial statements are misleading are 'fraud by hindsight' and do not state a claim." (citation and internal quotation marks omitted).)

## 1. Statements of Opinion under *Omnicare*

 Under the Supreme Court's holding in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, statements of opinion may convey a "material misrepresentation or omission" of fact, and thus form an actionable basis for securities fraud, in three circumstances: (1) where the statement falsely affirms that the speaker actually holds the stated belief; (2) where the statement contains embedded statements of fact which are false; or (3) where the statement omits particular and material facts going to the basis of the opinion. 575 U.S. 175, 186-91 (2015). However, "a sincere statement of pure

12

opinion," standing alone, "is not an untrue statement of material fact, regardless [of] whether an investor can ultimately prove the belief wrong." *Id.* at 186. An investor thus may not predicate a claim for securities fraud merely by "second-guess[ing] inherently subjective and uncertain assessments." *Id.* Moreover, an expression of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way. Reasonable investors understand that opinions sometimes rest on a weighing of competing facts . . . [a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement." *Id.* at 189-90. Indeed, whether facts omitted from an opinion render that opinion misleading such that liability may attach is judged from the perspective of the reasonable investor and includes consideration of the "full context" of the opinion. *Id.* at 186-87, 190.[6]

As the parties concede, Defendants' statements regarding Ascena's goodwill and tradenames constitute opinions. They rest on the accounting procedures outlined by GAAP for evaluating and testing these assets, which are not "a single objective set of calculations," and indeed, require the exercise of subjective judgment. *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. CV 13-7050, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017), *aff'd sub nom. In re Hertz Glob. Holdings Inc*, 905 F.3d 106 (3d Cir. 2018) (internal quotation marks and citation omitted). GAAP's Topic No. 350 requires that, in addition to

---

[6]     Before *Omnicare*, the Third Circuit had already held that opinions are actionable "if they are not honestly believed and lack a reasonable basis." *Edinburgh*, 754 F.3d at 170 (internal quotation marks and citation omitted). So, to some extent, *Omnicare*'s holding resembles the Third Circuit's pre-existing *Edinburgh* standard, although the Third Circuit rule may be considered to have been "more restrictive." *Ortiz*, 537 F. Supp. 3d at 666 (quoting *Kanefsky v. Honeywell Int'l, Inc.*, 2020 WL 2520669 at *5 (D.N.J. May 18, 2020)). *Omnicare*, it is true, was interpreting Section 11 of the Securities Act of 1933, and the Third Circuit has yet to adopt *Omnicare* for claims brought under Section 10(b) of the Securities Exchange Act. But courts in this Circuit, including this one, have found it to be "illuminating" as to Section 10(b) claims. *See Ortiz*, 537 F. Supp. 3d at 666. Out of caution, I analyze Plaintiffs' claims under *Omnicare* because a violation of that standard would necessarily violate *Edinburgh's* more restrictive one.

13

annual testing, goodwill be tested for impairment where events or circumstances suggest that the fair value of a company's goodwill has fallen below the recorded value of that goodwill in the company's financial statements.[7] (Compl. ¶¶ 42-43.) Examples of such events or circumstances include increased competition, changes in the market for a company's products, changes in a company's strategy or customers, declining revenues or earnings compared with prior periods, or sustained decreases in a company's share price. (Compl. ¶ 42.) GAAP's guidelines for intangible assets with infinite useful lives, such as tradenames like Ann Taylor and LOFT, follow a similar scheme: "these assets are to be tested for impairment annually and more frequently if events or changes in circumstances indicate it is more likely than not that the asset is impaired." (Compl. ¶ 44.) As with goodwill, events or circumstances indicating that a tradename may be impaired include increased competition, changes in the market for a company's products, and declining revenues or earnings compared with prior periods. (Compl. ¶¶ 47-48.)

These guidelines are not fixed rules; they clearly involve judgments that are "often subjective" and "encompass[] a wide range of acceptable procedures." *See Hertz*, 2017 WL 1536223, at *11 (internal quotation marks and citation omitted); *see also N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15 CIV. 6034 (RJS), 2016 WL 5794774, at *9 (S.D.N.Y. Sept. 30, 2016) ("It is well-settled that GAAP provisions are subject to interpretation and tolerate a range of reasonable treatments, leaving the choice among alternatives to management." (internal quotation marks and citation omitted)). As other courts have noted, the act of evaluating an intangible asset's fair value is subjective and the result only an opinion. *See, e.g.*, *Ortiz*, 537 F. Supp. 3d at 666-68 (D.N.J. 2021) (noting that multiple courts have found that determining the "fair value" of a company's

---

[7]     The "fair value" of a company or reporting unit, including its goodwill, refers to the price that could be obtained to sell the company or unit as a whole and is best measured by reference to quoted market prices. (Compl. ¶ 43 n.5.)

assets, including its goodwill, is an "inherently subjective" process); *In re Eros Int'l PLC Sec. Litig.*, No. CV 19-14125, 2021 WL 1560728, at *8 (D.N.J. Apr. 20, 2021) (finding that valuations of intangible assets constitute opinion statements); *Behrmann v. Brand*t, No. CV 19-772-RGA, 2020 WL 4432536, at *8 (D. Del. July 31, 2020) ("[G]oodwill estimates are opinion statements because they depend on management's determination of the fair value of the assets acquired and liabilities assumed, which are not matters of objective fact and will vary depending on the particular methodology and assumptions used." (internal quotation marks and citation omitted)). Just as determining the value of intangible assets is subjective, so too is assessing changes in that value, as the multi-factor guidance of GAAP makes clear. *See Hertz*, 2017 WL 1536223, at *11. Indeed, it is true as well that a company's statement about its compliance with GAAP also constitutes an opinion. *Id.*

### 2. Claims under Section 10(b) of the Securities Exchange Act and Rule 10b-5

Here, Plaintiffs do not sufficiently plead that Defendants' statements about Ascena's valuation were false or misleading under *Omnicare* because they have not shown that Defendants disbelieved their own statements; conveyed false statements of fact; or omitted material facts going to the basis of their opinions. The numerous statements cited by Plaintiffs—both those in Ascena's SEC filings and those in Defendants' public comments—only demonstrate that Jaffe and Giammatteo were aware that Ascena faced an increasingly difficult business environment during the Class Period. These difficulties, most notably prolonged decreases in customer traffic, corporate earnings, and share price, are indeed factors to be considered under GAAP in determining the value of a company's goodwill and tradenames, the advisability of interim impairment testing, and the necessity of an impairment charge. And while GAAP does not afford unlimited discretion to a public company's accountants, it nonetheless leaves to a company's judgment the fixing of the point at which such difficulties warrant the reevaluation of its intangible assets. Here, Jaffe and Giammatteo's statements of opinion about Ascena's

goodwill and tradenames, as expressed in their public comments and in Ascena's SEC filings, are not false within the meaning of *Omnicare* simply because both corporate officers knew that Ascena faced an increasingly difficult business environment. Indeed, they *said* that publicly. And as already noted, GAAP's guidelines are not ironclad commandments, and none of the problems in Ascena's business cited by Plaintiffs appear so great or so apparent as to show that Defendants disbelieved their own statements or otherwise factually misled investors.

Indeed, Plaintiffs are less than clear on exactly what species of falsity under *Omnicare* they are alleging, and none of the three are obvious fits. Plaintiffs repeatedly allege that Defendants either "knew but failed to disclose" or "recklessly disregarded" that the difficulties Ascena faced, especially the falling earnings and customer traffic of its ANN brands, indicated that Ascena's goodwill and tradenames had "artificially inflated values and that an impairment charge was necessary" in order to make Ascena "appear more profitable than it actually was." (Compl. ¶¶ 61-62, 67, 72, 88, 101, 109.) Similarly, the Complaint alleges that Defendants "knowingly or recklessly" caused Ascena to file financial statements that contained (1) "materially misleading representations of fact about Ascena's policies of accounting for goodwill and other intangible assets" and (2) material overstatements of Ascena's assets and understatements of its expenses. (Compl. ¶¶ 64, 70, 78, 95-96, 103, 111.)

Read broadly, these claims are facially deficient, not least because they sidestep *Omnicare*'s careful distinction between statements of fact and opinion. Liability for an expression of opinion under *Omnicare* is predicated on untrue statements of fact inherent to that opinion, namely the fact that the speaker holds the stated belief, those facts embedded in the opinion, and any facts omitted that are material to the speaker's "inquiry into or knowledge concerning a statement of opinion." *Omnicare*, 575 U.S. at 183-186, 189. Defendants' statements regarding the value of Ascena's goodwill and

16

tradenames, the necessity of an impairment analysis at any particular time, and the company's compliance with GAAP cannot themselves constitute falsehoods within the meaning of *Omnicare*; all, as noted above, are expressions of opinion, and only untrue statements of fact inherent in such opinions are a proper basis for liability. *See Omnicare*, 575 U.S. at 186. Moreover, Plaintiffs' allegations that Ascena's SEC filings contained material misrepresentations of fact regarding accounting for goodwill and tradenames or Ascena's assets and expenses is too conclusory and vague to support a claim under Section 10(b). *See Rahman*, 736 F.3d at 242 (quoting 15 U.S.C. § 78u-4(b)(1)). Without greater specificity as to what facts were materially misstated, such allegations appear only to reiterate Plaintiffs' argument that the values assigned to Ascena's goodwill and tradenames during the Class Period were erroneous, an insufficient basis for liability.

So we might try interpreting Plaintiffs' allegations more narrowly, molding them to the requirements of *Omnicare*. Even so, the allegations do not yield a viable claim under Section 10(b). Plaintiffs allege falsity, but cite no material fact embedded within Ascena's SEC filings or Defendants' public statements that is false (or knowingly so). Instead, Plaintiffs take greatest issue with the *conclusions* that Defendants drew from the facts known to them about Ascena's business during the class period. Such facts, such as falling earnings, customer traffic, and share price, may indeed show that different corporate directors could have valued Ascena's intangible assets differently. They do not, however, establish that Defendants' statements about Ascena's performance or the basis for their opinions were untruthful. Moreover, rather than omitting material information, Defendants appear to have been candid about Ascena's difficulties, warning investors throughout the Class Period that Ascena's earnings were falling, (Compl. ¶¶ 62, 68, 73-76, 89-91, 104-05, 112-13), customer traffic in stores was declining, (Compl. ¶¶ 68, 73-76, 89-91, 104-05, 112-13), and that Ascena expected these challenges to persist, (Compl. ¶¶ 73, 92-93, 106, 112-13.)

Remaining then is the question of whether Plaintiff has sufficiently alleged that Defendants' statements regarding the value of Ascena's goodwill and tradenames were either insincere or made in reckless disregard of the challenges facing Ascena, such as falling earnings, customer traffic, or share price. Again however, the factual basis of such a claim is lacking because Defendants' statements do not, on their own, show that they knew their evaluation of Ascena's goodwill and tradenames was false or misleading. Of course, a company's intangible assets "do[] not go from being unimpaired to fully impaired overnight," and the magnitude of Ascena's ultimate $1.3 billion write-down certainly suggests that Defendants' valuations were overly optimistic and that an impairment could or even should have been recorded earlier. *See Dudley v. Haub*, No. 2:11-CV-05196 WJM, 2013 WL 1845519, at *12 (D.N.J. Apr. 30, 2013). But without more evidence suggesting otherwise, Ascena's impairment charge appears better explained as a result of Defendants' mistakes, bad luck, or poor performance, not a longstanding effort by Defendants to dupe investors and fraudulently inflate Ascena's share price. Indeed, Ascena conducted its annual impairment test in September 2016 and found, applying GAAP, that no impairment charge was then necessary for its goodwill or other intangible assets, further bolstering Defendants' argument that their statements were reasonably based on the information available to them. (Compl. ¶¶ 83-87; Supp. Memo. at 4.) To show that Defendants never truly believed their own valuations of Ascena's goodwill and tradenames, Plaintiffs rely heavily on Defendants' statements acknowledging that the negative trends in Ascena's business which ultimately led to the impairment charge had persisted throughout the class period. (*See* Compl. ¶¶ 114-17, 120.) Most significantly, they cite Giammatteo's statement to investors in June 2017 that the impairment charge "represents a significant change in the market environment we've seen over the past couple of years." (Compl. ¶ 120.) It is common for such trends to unfold over time. Defendants seem to have been saying that they rued their prior statements, not that that they contemporaneously disbelieved them, thinking an impairment charge was

18

needed sooner but telling the public otherwise. *See Ortiz*, 537 F. Supp. 3d at
659 (noting that "[a]llegations that a company's later financial difficulties imply
that earlier financial statements are misleading are 'fraud by hindsight'" and
are inadequate to state a claim." (quoting *Nat'l Junior Baseball League v.
Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 537 (D.N.J. 2010))).

Allegations of insincerity aside, Plaintiffs have also failed to sufficiently
plead that Defendants' statements evinced reckless disregard of problems with
Ascena's performance. In order to state a Rule 10b–5 claim based on
recklessness, Plaintiffs must allege a reckless statement constituting "not
merely simple, or even inexcusable negligence, but an extreme departure from
the standards of ordinary care, and which presents a danger of misleading
buyers or sellers that is either known to the defendant or is so obvious that the
actor must have been aware of it." *Rahman*, 736 F.3d at 243 n.4 (quoting
*Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 493 (3d Cir.2013)). Defendants'
evaluations of Ascena's goodwill and tradenames may have been unwise or
overly confident, but they nonetheless were determined in line with GAAP
guidelines and without any demonstrated departure, extreme or otherwise,
from the standards of ordinary care. Similarly, Defendants' opinions on the
value of Ascena's intangible assets did not present such a clear danger of
misleading investors that I can conclude Defendants must have been aware
they were being misleading, even if their opinions were ultimately proven
wrong.

Accordingly, and viewing the statements cited by Plaintiffs in context, *see
Omnicare*, 575 U.S. at 190, I find that Plaintiffs' complaint is subject to
dismissal based on its failure to sufficiently allege that Defendants made an
actionably false statement. For the sake of completeness and for the guidance
of the parties, I will turn next to Plaintiffs' allegations of scienter.

**B. Scienter**

Plaintiffs' allegations that Defendants possessed the necessary scienter
rest on a variety of sources, primarily Jaffe's and Giammatteo's statements in

press releases and investor conference calls in which they acknowledged problems facing Ascena's business—problems that ostensibly showed Ascena's goodwill and tradenames to be overvalued and demonstrated the need for an impairment analysis. (*See, e.g.*, Compl. ¶¶ 6, 62, 68, 73-74, 76, 89-90, 92-93, 104-06, 112-13; Supp. Op. at 7-8.) They urge that Jaffe and Giammatteo were made further aware of these problems' significance for Ascena's valuation through information gleaned from Ascena's internal reporting mechanisms and through their own expertise. (*See, e.g.*, Compl. ¶¶ 20, 126-130.) Plaintiffs also claim that the sheer size and importance of Ascena's ultimate write-down belie any claims by Defendants that they were ignorant of Ascena's deteriorating value; the loss amounted to over $1.3 billion, nearly a quarter of Ascena's overall value, and primarily arose from ANN, one of Ascena's "core" businesses comprising approximately one third of Ascena's annual sales. (*See, e.g.*, *id.* ¶¶ 2, 5, 131-32.) Finally, they maintain that Jaffe had a "unique" motivation to conceal Ascena's deteriorating value because his parents founded the company and he did not want to "admit failure and accept responsibility" for a business "calamity." (*Id.* ¶ 133; Op. at 3, 26; Supp. Op. at 7.) Plaintiffs argue that these factual allegations, taken collectively, give rise to a sufficiently strong inference of scienter for their complaint to survive Defendants' motion to dismiss.

Defendants respond that the more plausible explanation for their behavior is the more benign one: They "signed Ascena's class period financial statements[] genuinely and reasonably believing Ascena's estimates of goodwill." (Supp. Memo. at 6.) Indeed, they urge that their statements in press releases and investor conference calls show that they were forthright in disclosing the challenges facing the company, from flagging earnings to changing customer behavior. (*Id.* at 6.) They maintain that Plaintiffs have only pleaded that Defendants were aware of "objective factors" (*e.g.*, deteriorating earnings, share price, or customer traffic) that ultimately were the basis for the $1.3 billion impairment charge, but have failed to show that Defendants

believed these factors warranted impairment testing pursuant to GAAP earlier than May 2017. (*Id.* at 7-10.)

As noted already, deciding whether Plaintiff has adequately pleaded scienter under the "exacting" standards of the PSLRA requires me to consider Plaintiff's factual allegations collectively and weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs,* 551 U.S. at 313, 322-24. While I view Plaintiffs' factual allegations as a whole, I will necessarily address each type of evidence for scienter separately for analytical clarity. *See In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 115 (3d Cir. 2018) ("We have explicitly approved of scienter analyses that assess individual categories of scienter allegations individually when it is clear, as it is here, that a district court ultimately considered the allegations as a whole.").

First, I turn to Jaffe's and Giammatteo's statements in press releases and investor conference calls. Though their statements in these contexts demonstrate Defendants' awareness (and indeed disclosure) of underlying weaknesses in Ascena's businesses, I cannot find that these statements yield a strong inference that Defendants knew Ascena's goodwill and tradename valuation was incorrect or decided to delay conducting an impairment test that would be dictated by GAAP. As noted, management has broad discretion here; the accounting principles governing both the valuation of goodwill or tradenames and the advisability of an impairment test "are plainly not matters of objective fact but rather are inherently subjective and involve management's opinion." *See Ortiz*, 537 F. Supp. 3d at 666 (internal quotation marks and citation omitted); *see also Hertz*, 2017 WL 1536223 at *11 (noting that "GAAP standards are often subjective" and "encompass[] a wide range of acceptable procedures"). Plaintiffs' allegations more plausibly yield the inference that Defendants' valuations of Ascena's goodwill and tradenames were judgment calls—reasonable at the times they were made, even if ultimately shown to be overly optimistic. To put it another way, these rosy assessments of Ascena's

assets may bespeak mistakes in Ascena's management—Ascena did after all declare Chapter 11 bankruptcy in 2020—but they do not constitute culpable conduct demonstrating the necessary scienter for securities fraud.

Moreover, as noted above, Jaffe's and Giammatteo's public statements included multiple warnings to investors about the Ascena's declining earnings, falling customer traffic, and difficulty in adapting to these challenges. (*See* Compl. ¶¶ 62, 68, 73-76, 89-93, 104-06, 112-13.) That both Defendants appear to have been candid with the investing public about Ascena's deteriorating business itself "significantly detract[s[ from any inference of scienter." *See Teamsters Loc. 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 472 (E.D. Pa. 2019). Indeed, one might expect that Defendants would have tried to withhold or hide negative information about Ascena if they were trying to "artificially inflate" the value of its goodwill and tradenames, but the complaint pleads no such facts.

Next, Plaintiffs' allegations that Ascena's internal reporting mechanisms and Defendants' own expertise provided them with scienter are similarly deficient. They demonstrate at best that Jaffe and Giammatteo were aware of Ascena's business difficulties, not that they believed those difficulties so affected the value of Ascena's goodwill and tradenames that an interim impairment test or write-down was warranted. A complaint does not sufficiently plead scienter where it relies on "[g]eneralized imputations of knowledge" that defendants "must have known" a statement was false by virtue of their positions within the company. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006) (*quoting In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999); *see also Rosenbloom v. Adams, Scott & Conway, Inc.*, 552 F.2d 1336, 1338–39 (9th Cir.1977) ("A director, officer, or even the president of a corporation often has superior knowledge and information, but neither the knowledge nor the information necessarily attaches to those positions."). Plaintiffs attempt to meet their pleading burden by pointing to the means of information dispersal within Ascena: Ascena's "common information

22

technology platform," weekly management meetings, and retention of the consulting firm Accenture to improve Ascena's operations. (Compl. ¶¶ 126-129.) Yet Plaintiff does not allege that any of these sources informed Defendants that the value of Ascena's goodwill and tradenames had deteriorated. At most, they suggest that Defendants were well informed about the difficulties facing Ascena's business and believed—ultimately wrongly—that Ascena's intangible assets had nevertheless not been impaired, or at least not impaired yet. Standing alone, Jaffe's and Giammatteo's awareness of these difficulties is insufficient to demonstrate the intent to defraud or mislead needed for scienter. Rather, Ascena's "shared information technology platform," its management meetings, and its retention of a consultant best show "corporate management's general awareness of the day-to-day workings of the company's business," a fact which "does not establish scienter-at least absent some additional allegations of specific information conveyed to management and related to fraud." *Rahman*, 736 F.3d at 247 (quoting *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008)). In short, these are "must have known" allegations of the kind rejected in *In re Suprema, supra.*

Plaintiffs argue with more force that the sheer magnitude of Ascena's goodwill and tradenames impairment—over $1.3 billion and nearly 25% of Ascena's entire value—points to scienter. *See Hertz*, 905 F.3d at 116. I agree that it is a valid factor. However, the "inferential force" of the sheer size of the write-down is weakened where, as here, the complaint lacks "particularized allegations of fraudulent intent," or detail suggesting that "defendants had any contemporaneous basis to believe that the information they related was incorrect" *Id.* (internal quotation marks and citations omitted). As with their prior allegations, Plaintiffs simply offer too little in the way of facts to show that Defendants' conduct was motivated by fraudulent intent or that they disbelieved their own statements. Without more, the $1.3 billion impairment charge more plausibly reflects the collision of Ascena's "expansion-driven

23

strategy" with changes in the clothing retail market—bad luck or an unsuccessful strategy, perhaps, but a slender basis for an inference of scienter. Thus. while the size and importance of this impairment may provide some basis to infer scienter, I do not find it to be a strong inference.

Finally, I address Plaintiffs' allegation that, because Jaffe is the son of Ascena's founders, he has a particular incentive to conceal any failings in Ascena's business. As Defendants note, this alleged motive is hardly unique to Jaffe; many a corporate officer, whether related to the founder or not, would fear "admit[ing] failure and accept[ing] responsibility" for a business "calamity."[8] (*See* Compl. ¶ 133; Supp. Memo. at 10). Yet "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *Avaya*, 564 F.3d at 278 (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004)). It's far from evident that a generalized sense of filial loyalty or desire to burnish a company's image constitutes a benefit that is either concrete or personal to Jaffe. Moreover, Jaffe's alleged motivation would clearly not be shared by Giammatteo, who allegedly behaved in a similar manner. *See Winer Fam. Tr. v. Queen*, 503 F.3d 319, 335–36 (3d Cir. 2007) (noting that the PSLR requires a complaint to make specific allegations of scienter as to each defendant).

Viewing Plaintiffs' evidence of scienter as a whole, I find that the allegations indicate that Defendants were aware of Ascena's deteriorating business, but fail to raise an inference of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent." *See Tellabs*, 551 U.S. at 314. Plaintiff's complaint is thus subject to dismissal on the additional and alternative basis that it has failed to adequately allege scienter.

---

[8]    The weakness of the inference is demonstrated by the ease of positing its opposite: that a family member, as opposed to an officer hired with the expectation of results, might feel *more* secure in his position.

24

IV.    **DISCUSSION: SECTION 20(a) CLAIM (COUNT 2)**

Liability under Section 20(a) is predicated upon an independent violation of "this chapter or the rules or regulations thereunder." 15 U.S.C. § 78t-1(a); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 207 (1st Cir. 1999). Claims under Section 20(a), therefore, are "derivative—requiring proof of a separate underlying violation of the Exchange Act." *In re Milestone Scientific Sec. Litig.*, 103 F. Supp. 2d 425, 474 (D.N.J. 2000). Since plaintiffs fail to offer sufficient evidence that Defendants made an actionable false statement or possessed the requisite scienter to state a plausible claim under Section 10(b) and Rule 10b-5, their claim under Section 20(a) lacks a predicate violation of the Exchange Act and so must also be dismissed.

V.    **DISCUSSION: PLAINTIFFS' REQUEST FOR LEAVE TO AMEND**

Having dismissed Plaintiffs' complaint, I will do so without prejudice to the submission of a properly supported motion to amend. Plaintiffs represent that in the course of their investigation of this case, they have identified "new allegations from confidential witnesses . . . detailing that management monitored the ongoing impairment at its underperforming stores" and that Ascena's internal systems allowed management "to monitor and analyze the Company's operational data." (Supp. Op. at 10). I note that the evidentiary value of confidential sources' information will be assessed according to the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Rahman*, 736 F.3d at 244 (quoting *Avaya*, 564 F.3d at 261). Any amended pleading shall address the deficiencies I have identified in Plaintiffs' allegations of material misrepresentation and scienter.

## VI.   CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is **GRANTED** without prejudice to the filing of a properly supported motion to amend the complaint within 40 days.

A separate order will issue.

Dated: June 28, 2022

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**